OPINION
{¶ 1} Plaintiff-appellant, Richard P. Kozma ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas in which that court granted summary judgment to appellees, AEP Energy Services, Inc. and American Electric Power Corporation (collectively referred to hereinafter as "AEP"), as to appellant's claim for age discrimination. For the reasons that follow, we affirm.
 {¶ 2} The following facts are taken from the pleadings, the transcripts of appellant's deposition and that of AEP employee Paula May ("May"), or are undisputed by the parties. AEP is engaged in the business of buying and selling energy products, including electricity, natural gas, coal and crude oil. AEP hired appellant in March 1998, when he was 45 years old, for the position of Operations Manager for its Western Trading Group. In September 2001, appellant advanced to the position of Manager of the Power Volume Management Group ("PVMG"), which position was located in the "energy services mid/back office" in Columbus.
 {¶ 3} Early in the fall of 2002, AEP announced that it would undertake a corporate restructuring program entitled "Sustained Earnings Initiative" ("SEI"), which included a plan for a reduction-in-force — or layoffs — in its Columbus offices.[1] Following the announcement, a retention and layoff schedule was prepared, indicating which employees in the energy services mid/back office would be laid off in at least two planned "waves" of layoffs, and which employees would ultimately be retained.[2] Appellant's name appeared on the list of those proposed to be "released."[3]
 {¶ 4} The first wave of the SEI occurred in November 2002. As this initial wave approached, appellant inquired of his supervisor, Tim Trumpler ("Trumpler"), whether he should be concerned about his job. Trumpler responded in the affirmative, and indicated he did not know precisely when appellant would be terminated, but that appellant needed to start looking for a new job.[4] Trumpler stated that appellant would not be released during the first wave of the SEI.[5] When asked why appellant had been chosen for release, Trumpler stated he did not know why appellant was being released.[6]
 {¶ 5} On November 5, 2002, appellant e-mailed Steve Appelt ("Appelt"), who then held the position of Executive Vice President, Administration. In his message, appellant inquired whether the number of weeks of any severance package he accepted in conjunction with his being laid off would count toward his total years worked, for purposes of the vesting of his pension plan. He indicated, "I'm less than 4 months away from my 5 year anniversary with AEP (March 8, 2003)."[7] Appelt responded that severance pay is not normally considered for purposes of pension vesting, but that appellant should ask other specific individuals whether he could remain on the payroll for the equivalent number of weeks of regular salary payments in lieu of a lump-sum severance payment, and thus reach the date upon which his pension plan would be fully vested. When appellant approached Trumpler about his pension vesting concerns, Trumpler replied, "Rich, I think we can make that date. I don't think we need to worry because there's plenty of work that still needs to get done and [Appelt] has less people to do it."[8]
 {¶ 6} In mid-November 2002, Trumpler called appellant into his office for a meeting that also included May, who then occupied the position of Director of Power Accounting. Trumpler and May asked appellant, "what do you think about having Tony DiGioia replace you as the manager of power volume management."[9] At the time, Tony DiGioia ("DiGioia") was appellant's counterpart for AEP's Gas Settlements Accounting Group.[10]
Appellant responded, "yes, I think that could work."[11] Then, Trumpler and May made the following proposal:
[T]his is what we'd like to offer you. We'd like to have you take on a special project until you're no longer here. We can keep you employed on this project until the end of May. But we — this project needs to be worked on. You're the perfect person. It would give you what you want, which is a job through at least March, and give AEP what they need which is somebody to handle this project. It would give Tony [DiGioia] time to learn and you'd train him because you would still be there. In fact, you'll move your seat. He'll take your seat and you can help him learn your job so that we can make this transition.[12]
 {¶ 7} Upon hearing this proposal, appellant thought, "* * * cool, I'm going to have employment * * * at least through May, which means I'll get my pension."[13] When appellant asked when Trumpler and May wanted this change to occur, they replied that they would like the transition to occur in mid-December. Trumpler initiated a conversation about offering appellant a retention package, the specifics of which Trumpler was not prepared to set forth at that time. Following his meeting with Trumpler and May, because a written retention plan was not yet in place, appellant immediately began contacting acquaintances regarding potential employment opportunities. Later, in early December, Trumpler approached appellant with an offer of $25,000 in severance pay plus a retention bonus of $25,000 if appellant remained full-time through May 31, 2003. The retention payment would be prorated if appellant left before that date to take a position elsewhere.
 {¶ 8} Specifically, appellant was to work during his "retention period" as the head of a project known as the "PJM Shadow Settlement Project" ("the project"). The project entailed the establishment of a system that would effectively accomplish settlements (accounting) of AEP's energy trading activities within a new regional market (or network) that AEP planned to enter. The new market was called the "Pennsylvania — New Jersey-Maryland" network, or "PJM."[14] AEP planned to become a member of this market on April 1, 2003.[15] The project was to continue through the end of May in order to give AEP one full month of data following AEP's joining of PJM, plus one month to confirm that the system was working properly. Then, appellant's task was to "hand off at that point to the power volume management group."[16] According to appellant, when the project was proposed to him, he understood that:
[t]his job would normally come underneath the purview of the power volume management group. They're making a change and putting Tony [DiGioia] in my place. Tony does not have the power experience or the breadth of knowledge to handle this particular project on top of learning the necessary skills to handle this department.
So they said, this would be great for us. You can handle this project. You can train Tony and we can get ourselves prepared to be entering into PJM. You're uniquely qualified to be able to handle that. Tony can't handle it because he doesn't have the background yet.[17]
 {¶ 9} Appellant thought that the plan "[made] sense" and was "a good use of personnel."[18] Trumpler told appellant that the change in management of the PVMG from appellant to DiGioia would become effective on December 15, 2002.[19] Contemporaneously, the Gas Settlements Accounting Group, headed by DiGioia, was consolidated with the PVMG, and both groups came under DiGioia's direction.[20] According to appellant, his special assignment to work on the project officially commenced on the following day, December 16, 2002.[21] On that date appellant "had a meeting with the staff and made the transfer and moved my desk."[22] Appellant's desk was moved at his suggestion so that those that reported to the PVMG manager position would start going to DiGioia "more readily" and would stop going to appellant.[23]
 {¶ 10} The duties associated with the project kept appellant busy on a full-time basis.[24] Appellant stated he could not quantify how much of his workweek was spent training DiGioia, and stated, "I left that up to Tony for a large part."[25]
There was no formalized training, per se * * *.
But the training took up more things like this. And if you were Tony, you would ask — come over and say, Rich, I'm having trouble understanding some of these things that are happening * * *. Can you help describe what's happening there. All right. Let's go over it.
And we'd go over it. He'd get an idea, get more familiar with the data and how it moves, who's using it and what the needs are. And the other implications for our systems downstream within AEP. And that's how the training occurred.
So I'd be doing that at the same time I'd be sitting at my desk either reading documents for PJM or working up and reading e-mails * * *.[26]
DiGioia asked more questions and sought more of appellant's assistance in the initial period following the mid-December transition than he did in later weeks.[27]
 {¶ 11} Appellant worked full-time on the project until it prematurely ended in March or April 2003.[28] At that point "it was decided that * * * AEP was not going to go any further into the PJM market expansion."[29] On March 5, 2003, after becoming aware that AEP was not going to join the PJM market as previously scheduled, appellant wrote an email to Trumpler and May.[30] Therein, appellant related that "[i]t is expected that the earliest start date [for PJM entrance] to be October 1, 2003 * * *. Due to this change, the sense of urgency attached to the PJM Shadow Settlement Project has diminished to the point that we might want to re-consider the resources allocated to this project."[31]
 {¶ 12} Appellant went on to remind Trumpler and May about the retention arrangement to which they had previously agreed, with particular emphasis upon the timetable that had been discussed. He stated, "[s]ince the time frame for our entry into PJM has been delayed, you may be considering adjusting my termination date to better align with the `Sustained Earnings Initiative.' To that end, may I suggest a meeting to discuss the implications of AEP's delayed entry into the PJM market, the allocation of resources and my employment at AEP."[32] Finally, appellant suggested that control over the PJM Shadow Settlement Project be shifted to two other named AEP employees. According to appellant, the purpose of this e-mail was to anticipate what Trumpler and May might be thinking and to propose reallocation of the PJM project to others so that they could reassign appellant to "another project that may be available so that I would be able to stay on through the end of the regular retention plan."[33] This was especially important, according to appellant, because "word on the street" was that another wave of layoffs was imminent. "So I was trying to position myself to at least stay on through the original retention plan, at least."[34]
 {¶ 13} In response, Trumpler and May met with appellant on March 13, 2003. Trumpler proposed that appellant cease work on the PJM project and instead work on a project called "PTMS Settlement" that was already in progress. It was agreed that the retention plan previously tied to appellant's work with the PJM project would now be tied to the PTMS Settlement project.[35] The PTMS Settlement project involved the integration of the regulated internal accounting systems with new, unregulated wholesale energy markets, and the coordination of the same with AEP's family of companies so as to ensure a system that was more automated and auditable.[36] Prior to his actual assignment to the PTMS Settlement project, appellant had had some involvement therewith as a "resource for information."[37] Appellant continued to work for AEP on the PTMS project through his last day with the company, which was May 31, 2003, as scheduled.[38] His fully vested pension was subsequently paid out in the amount of $64,000.[39] Additionally, appellant received his severance payment and his $25,000 retention payment as agreed.[40]
 {¶ 14} On June 23, 2003, appellant instituted this action in the Franklin County Court of Common Pleas. He asserted a claim for age discrimination in violation of R.C. 4112.02(A). The factual allegations contained in his complaint consist entirely of the following:
1. Plaintiff was employed by defendants as Manager of Power Volume Management Group and was advised that at age 50 he was being replaced by a 29 year old employee with no experience in his area of responsibilities.
2. Plaintiff was asked by his supervisor to train the 29 year old for 6 months in his job, at which point plaintiff's job was eliminated and he was terminated on May 30, 2003.
3. Defendants are employers within the meaning of O.R.C. Section4112.02(A)(2).[41]
 {¶ 15} On March 29, 2004, AEP filed a motion for summary judgment. AEP argued both that appellant's claim was barred by the applicable statute of limitations, and that, on the evidence adduced, AEP was entitled to summary judgment on the merits. After the motion was fully briefed, the trial court issued a decision and entry dated May 28, 2004, in which it granted AEP's motion on the sole basis that appellant's claim is barred by the applicable statute of limitations. Appellant timely appealed and advances one assignment of error for our review, as follows:
The trial court erred in granting defendants' motion for summary judgment based upon the statute of limitations.[42]
 {¶ 16} We review the trial court's grant of summary judgment de novo.Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38, 654 N.E.2d 1327. Summary judgment is proper only when the party moving for summary judgment demonstrates: (1) no genuine issue of material fact exists, (2) the moving parties are entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, when the evidence is construed in a light most favorable to the nonmoving party. Civ.R. 56(C); State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. We construe the facts gleaned from the record in a light most favorable to appellant, as is appropriate on review of a summary judgment. We review questions of law de novo. Nationwide Mut. Fire Ins. Co. v. Guman Bros.Farm (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684, citing Ohio BellTel. Co. v. Pub. Util. Comm. (1992), 64 Ohio St.3d 145, 147,593 N.E.2d 286.
 {¶ 17} In their briefs, the parties have engaged in vigorous debate over the applicability of the following passage to our review of the trial court's grant of summary judgment:
* * * [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."
Reeves v. Sanderson Plumbing Products, Inc. (2000), 530 U.S. 133, 151,120 S.Ct. 2097, 147 L.Ed.2d 105. (Citations omitted.)
 {¶ 18} Based upon the foregoing, appellant argues that this court must disregard Trumpler's affidavit and May's deposition transcript, both of which were submitted with AEP's motion for summary judgment. Appellant argues that Trumpler and May are not "disinterested witnesses" but, as former or current employees of AEP, are biased and "could be disbelieved by the jury."[43] Appellant contends that the only evidence that should be considered at the summary judgment stage is the evidence that he has provided.
 {¶ 19} Relying upon the decision of the United States Court of Appeals for the Sixth Circuit in Smith v. Honda of America Mfg. (C.A.6, 2004), 101 Fed. Appx. 20, AEP argues that the court is permitted to take as true, for purposes of summary judgment, any uncontroverted statements of Trumpler or May. Specifically, AEP relies on the following language fromSmith:
Reeves-read in the context of the authority cited by the Supreme Court and other unchallenged Supreme Court precedents-does not require the exclusion of all interested party testimony. At summary judgment, the judge may consider all "evidence [favorable to the movant] that the jury is required to believe." Wright Miller, supra, § 2529, at 299. Such evidence includes "uncontradicted and unimpeached evidence from disinterested witnesses," but under some circumstances even the testimony of an "interested witness . . . must be believed." Wright Miller. supra, § 2527, at 287-88. In particular, "the testimony of an employee of the [movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it readily could have been shown to be so. Wright Miller, supra, § 2527, at 287 n. 9 (citing Chesapeake Ohio R.R. v.Martin, 283, U.S. 209, 216, 75 L. Ed. 983, 51 S.Ct. 453 (1931)). Even the testimony of the moving party that "is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and * * * is not opposed to the probabilities, nor, in its nature, surprising or suspicious, [need not be] denied conclusiveness." Chesapeake OhioR.R. 283, U.S. at 218.
Id. at 24.
 {¶ 20} We note that this court has previously cited the principles articulated in Reeves in reviewing a trial court's grant of summary judgment in a discrimination case. See, e.g., Baer v. The Scotts Co.
(Dec. 6, 2001), 10th Dist. No. 01AP-323. However, we find instructive the Sixth Circuit Court of Appeals' discussion of the role of Reeves in appellate review of summary judgment in the case of Phelps v. JonesPlastic Engineering Corp. (C.A.6, 2001), 20 Fed. Appx. 352. InPhelps, the court pointed out that Reeves involved appellate review of a trial court's denial of the defendant-employer's motion for a directed verdict, not a motion for summary judgment. The Phelps court explained:
Reeves's standard for Rule 50 motions focuses on situations where "a party has been fully heard on an issue" at trial and the defeated party questions whether there was "legally sufficient" evidence for the jury to rule in the other party's favor. In considering a motion for summary judgment, a court does not have the benefit of the full "quantum of evidence produced" at a trial. More fundamentally, the summary judgment standard addresses the limited, preliminary question of whether the plaintiff has produced sufficient evidence to demonstrate that a genuine issue of fact exists for the jury to decide, rather than the broader, decisive question of whether the plaintiff's evidence proves his case.
As such, this court reviews de novo the district court's grant of summary judgment.
Id. at 356. (Citations omitted.)
 {¶ 21} We also note that the Trumpler affidavit contains statements that, to the extent that they assist AEP, do so only as to the issue of the substantive merits of appellant's claim, not as to the issue of the effect of the applicable statute of limitations. Thus, we have not considered the Trumpler affidavit in our analysis. Furthermore, upon a thorough reading of the transcript of May's deposition, we find that any statements she made that may be helpful to an understanding of the facts pertinent to the statute of limitations issue (including those set forth herein, supra, at footnotes 2, 3, 10, 14 and 20) are uncontroverted, unsuspicious and not incongruent with any facts offered by appellant in his deposition, the source from which we have taken the majority of the pertinent facts recited hereinabove.
 {¶ 22} Therefore, in our view, the controversy between the parties over the applicability and effect of Reeves is not particularly consequential to our review. Remaining mindful that on summary judgment we are presented with a limited view of the full quantum of evidence that would be presented at trial,[44] and that we must conduct a de novo review of the entire record,[45] our inquiry remains focused on the question whether the discriminatory act that allegedly infringed on appellant's rights (and thus began the running of the applicable statute of limitations) occurred within the 180 days preceding the filing of his complaint.
 {¶ 23} The limitations period applicable to appellant's claim for age discrimination is found at R.C. 4112.02(N), which provides, "[a]n aggrieved individual may enforce the individual's rights relative to discrimination on the basis of age as provided for in this section by instituting a civil action, within one hundred eighty days after thealleged unlawful discriminatory practice occurred, in any court with jurisdiction for any legal or equitable relief that will effectuate the individual's rights." (Emphasis added.) An age discrimination claim brought pursuant to R.C. Chapter 4112 must be initiated within the 180-day statute of limitations period set forth in R.C. 4112.02(N).Bellian v. Bicron Corp. (1994), 69 Ohio St.3d 517, 520, 634 N.E.2d 608.
 {¶ 24} "[A] cause of action does not accrue until such time as the infringement of a right arises. It is at this point that the time within which a cause of action is to be commenced begins to run." State ex rel.Teamsters Local Union 377 v. Youngstown (1977), 50 Ohio St.2d 200, 203-204,4 O.O.3d 387, 364 N.E.2d 18. Thus, we must determine when (if at all, which issue is not before us) the actions of AEP infringed upon the right afforded appellant not to be the subject of age-based employment discrimination. AEP urges, and the trial court agreed, that appellant's cause of action accrued on December 16, 2002, the date upon which he was removed from his position as PVMG manager and placed on the PJM project pursuant to the retention arrangement between the parties. In the court below, appellant maintained that his cause of action did not accrue until May 31, 2003, his last day of employment with AEP. Appellant has retreated from this position to a certain degree, and has focused his brief to this court on the last date upon which he worked on the PJM project, which was March 5, 2003. Despite the fact that appellant's argument has shifted somewhat in emphasis, he nevertheless relies on the same case law upon which he relied in the trial court.
 {¶ 25} Appellant exalts the continuity of his duties as manager of the PVMG and his duties on the PJM project, and contends that the nexus between the two brings his assignment to the PJM project within the discriminatory act that triggers the running of the statute of limitations. According to appellant, even though he was replaced by DiGioia as manager of the PVMG on December 16, 2002, the PJM-related portion of the retention period was part of the same discriminatory act that began with his removal because his work on the PJM project included duties he would have performed had he remained in his former position. He argues that the statute of limitations did not begin to run until he was no longer performing any duties related to the PJM project — in other words, on March 5, 2003, at the earliest.
 {¶ 26} Appellant relies for support of this position on the cases ofOker v. Ameritech Corp. (2000), 89 Ohio St.3d 223, 729 N.E.2d 1177, andBd. of Edn. of the Lordstown Local School Dist. v. Ohio Civil RightsComm. (1981), 66 Ohio St.2d 252, 421 N.E.2d 511. In Oker, the plaintiff was employed as an in-house attorney for Ameritech when the company announced that the entire legal department would be abolished in favor of a newly created and reconstituted one. He was further informed that his position would therefore be eliminated but that he could apply for a position in the newly formed legal department. The plaintiff did apply for a new position but was informed in November 1994 that he would not be hired. However, he remained in his former position until January 7, 1995. Upon his termination from his attorney position, he accepted work as an AEP customer service representative, which position he occupied until he found legal employment elsewhere.
 {¶ 27} After a younger attorney was hired to handle litigation for Ameritech, the plaintiff sued for age discrimination. The trial court found the claim was barred by the 180-day statute of limitations. The Eighth District Court of Appeals affirmed, finding that the cause of action accrued in November 1994, when the plaintiff was informed he would not be hired. The Supreme Court of Ohio reversed, finding that the cause of action accrued not when the appellant was informed he would not be hired, but on January 7, 1995, the date of the plaintiff's termination from his former position. The court treated the November 1994 action not as a discriminatory failure-to-hire, but as advance notice of a future discriminatory termination. In the high court's view, there was no present, palpable violation of R.C. Chapter 4112 until the plaintiff inOker was terminated from his former position.
 {¶ 28} In Lordstown, the plaintiffs were two teachers whose yearly contracts with the defendant school district were not renewed following the plaintiffs' announcements that they had become pregnant. The non-renewal decisions were made in April 1975 and affected the contracts under which the two plaintiffs would have worked for the 1975-1976 school year. The court held that the teachers' cause of action for sex discrimination accrued not when the board announced its non-renewal decision, but when that decision became effective, which was the natural expiration date of the teachers' 1974-1975 contracts. The court relied on the principle that a cause of action does not accrue until an infringement of a right arises, and stated, "when one's conduct is not presently injurious a statute of limitations begins to run against an action for consequential injuries resulting from such act only from the time that actual damage ensues." Id. at 256, citing State ex rel. LocalUnion 377 v. Youngstown (1977), 50 Ohio St.2d 200, 203-204, 4 O.O.3d 387,364 N.E.2d 18.
 {¶ 29} AEP argues that its actions were only "presently injurious" and caused "actual damage," if at all, on December 16, 2002, the date appellant was removed from his position as manager of the PVMG, when the terms of his employment began to be governed by the retention agreement, and when he began work on a defined project with a finite end date, with no hope of continued employment beyond that date. AEP analogizes December 16, 2002 in the present case to January 7, 1995 in the Oker case and the expiration date of the teachers' existing contracts in Lordstown. AEP argues that appellant's complaint is clearly based on his removal from the position of manager of the PVMG and his replacement with DiGioia, actions that were both accomplished on December 16, 2002. Thus, according to AEP, appellant's claim was untimely since it was filed more than 180 days after December 16, 2002.
 {¶ 30} When interpreting R.C. Chapter 4112, it is appropriate to look at analogous federal statutes and case law. Wooten v. City of Columbus
(1993), 91 Ohio App.3d 326, 334, 632 N.E.2d 605; Beauchamp v.CompuServe, Inc. (1998), 126 Ohio App.3d 17, 22, 709 N.E.2d 863. The decision of the United States Supreme Court in Delaware State College v.Ricks (1980), 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431, a case applying the federal counterpart to Ohio's age discrimination statute, is particularly apposite to the instant matter. In Ricks, the plaintiff was a university professor who had been denied tenure. The college, like many colleges and universities, had a policy that junior faculty members who were not offered tenure were not immediately discharged, but were offered "terminal contracts" to teach for one additional year. The plaintiff accepted the college's offer of a one-year terminal contract, and sued for age discrimination shortly after the expiration thereof. The plaintiff alleged that his cause of action did not accrue until his last day of employment. The college maintained that the allegedly discriminatory action was its denial of tenure, not the ultimate expiration of the plaintiff's one-year terminal contract.
 {¶ 31} The United States Supreme Court agreed with the college, holding that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." Id. at 257, citing United Airlines, Inc. v. Evans
(1977), 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571. The court rejected the plaintiff's theory of a "continuing violation" because he had not identified specific discriminatory acts that continued until, or occurred contemporaneously with, the actual termination of employment. Ibid. The court characterized the termination of the plaintiff's employment as "a delayed, but inevitable, consequence of the denial of tenure." Id. at 257-258. The court went on to explain that, in order for the limitations period to commence at the date of discharge, "Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants." Id. at 258.
 {¶ 32} The court found that the only alleged discrimination occurred, and the limitations period therefore commenced, at the time of the tenure decision, "even though one of the effects of the denial of tenure — the eventual loss of a teaching position — did not occur until later." Ibid. (Emphasis sic.) The court explained that the "proper focus is upon the time of the discriminatory acts, not upon the time at which theconsequences of the acts became most painful." Ibid., (Emphasis sic.), quoting Abramson v. Univ. of Hawaii (C.A.9, 1979), 594 F.2d 202, 209. The emphasis must be on any present, injurious violation, "not upon the effects of the earlier employment decision[.]" Ibid.
 {¶ 33} One year after it decided Ricks, the United States Supreme Court applied the principles of that case in Chardon v. Fernandez
(1981), 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6. In Chardon, non-tenured school administrators in the Puerto Rico Department of Education were notified by letter that their appointments would terminate at later, specified dates. The court reversed the court of appeals' holding that the limitations period began to run at the termination of the appointments. The court found the facts in Chardon to be "indistinguishable" from those in Ricks, noting that "in each case, the operative decision was made — and notice given — in advance of a designated date on which employment terminated." Id. at 8. The court reiterated the notion that "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." Ibid., citing Ricks, supra, at 258. (Emphasis sic.)
 {¶ 34} The United States Court of Appeals for the Seventh Circuit followed Ricks in Mull v. ARCO Durethene Plastics, Inc. (C.A.7, 1986),784 F.2d 284, a case whose facts bear a significant resemblance to those of the case at bar. On April 18, 1979, ARCO informed Mull that he would be removed from his position on May 14, 1979, and that he could choose either to accept a demotion to a different, permanent position in another city (Philadelphia), or immediate termination with the option of early retirement. Following Mull's request that ARCO reconsider its decision, Mull attended a meeting with two superiors on May 2, 1979. At that meeting, after it was made clear that ARCO would not reconsider its decision to remove him from his position, Mull asked whether he could accept the lower-level position without relocating to Philadelphia. ARCO declined this but offered him the option of being placed on a temporary "special assignment" until his termination, which had been set as December 31, 1979. Mull agreed to be placed on special assignment, and, according to Mull's deposition, the parties understood that the special assignment would last until Mull agreed to accept the Philadelphia position or, at the latest, December 31, 1979.
 {¶ 35} On May 11, 1979, an internal memorandum was released announcing that Mull would be replaced in his former position, but would henceforth be placed on special assignment. On June 28, 1979, Mull formally rejected the Philadelphia position, and continued to work under his special assignment, which involved several long-range projects. When ARCO approached him, in November 1979, regarding retirement "signup" he refused, whereupon ARCO sent him a letter, dated December 6, 1979, indicating that he would be terminated effective December 31, 1979. This letter was the first written termination notice that Mull received.
 {¶ 36} On January 16, 1980, Mull instituted an action for age discrimination. He alleged that ARCO had illegally demoted him and eventually forced him to retire based on his age. The district court entered summary judgment in favor of ARCO on the demotion claim and the forced retirement claim, finding the same were barred by the applicable 180-day statute of limitations. The district court found Mull's cause of action accrued on May 2, 1979, the date when Mull was unequivocally informed that ARCO's decision to remove him from his position was final, and when he agreed to be placed on special assignment until no later than December 31, 1979.
 {¶ 37} The Seventh Circuit Court of Appeals agreed and, followingRicks and Chardon, held that "unequivocal notice of termination is all that is required to start the limitations period running[.]" Id. at 288. The court of appeals relied on the fact that "Mull acknowledged that he had been given three options, and apart from the permanent job in Philadelphia, the only option for continued employment was the temporary position which he conceded would terminate on December 31, 1979." Ibid. The court held that "[t]he only reasonable inference that can be drawn is that in rejecting both the Philadelphia job and immediate early retirement Mull necessarily accepted that the * * * special assignment * * * concededly ended with his termination on December 31." Id. at 289.
 {¶ 38} In the present case, appellant's cause of action accrued in early December 2002, when he was unequivocally informed that December 15, 2002 would be his last day as manager of the PVMG. Appellant manifested his understanding that it was AEP's intention to discharge him as manager of the PVMG when he orally agreed with Trumpler on the terms of the retention agreement. Because, however, the record is unclear as to the precise date upon which these events transpired, we find that appellant's cause of action accrued on the later date of December 16, 2002.
 {¶ 39} By that date the decision had been made and communicated to appellant that he would be removed from his position as manager of the PVMG and would be replaced with a younger employee, DiGioia. On that date he met with his staff, moved his desk and began work on the PJM project under an agreement with AEP the terms of which were materially different from those under which he had occupied the position of manager of the PVMG (e.g., a prorated retention payment, definitive end date, etc). In other words, on December 16, 2002, AEP's decision had present, palpable injurious effects, in that appellant had been discharged from his former position and replaced by a younger worker, and he was aware of such actions by AEP. Thus, on December 16, 2002, the 180-day limitations period began to run against appellant's cause of action for age discrimination as alleged in the complaint.
 {¶ 40} Though the end of the PJM project (March 5, 2003) and the expiration of the retention period (May 31, 2003) were related to his overall employment relationship with AEP, they were but remote and, for purposes of the statute of limitations, legally insignificant consequences of AEP's decision to release appellant from his position as manager of the PVMG. The end of the PJM project and appellant's eventual last day with the company were not discrete discriminatory acts that triggered anew the running of the statute of limitations. Rather, they can be characterized only as painful consequences of AEP's earlier decision to remove appellant as manager of the PVMG.
 {¶ 41} The date of December 16, 2002 in the present case is analogous to the date in Oker when the plaintiff was terminated from his former position and moved to a customer service position, and to the date inLordstown upon which the plaintiffs' former contracts naturally expired (i.e., were not renewed), and to the date in Ricks when the college communicated to the plaintiff its decision to deny him tenure, which decision, by regulation and custom sounded the death knell for the plaintiff's employment relationship with the college, even though he continued to teach for an additional academic year. In all of these cases, it is the date upon which the defendant's employment practice became presently injurious (i.e., infringed on the plaintiffs' right to be free from unlawful discrimination), not simply upon the bright-line date of the last day of the employment relationship.[46]
 {¶ 42} This is true in the present case despite the fact that appellant performed tasks during his retention period that he would have performed had he not been terminated as manager of the PVMG. The fact that some duties of the former position carried over into the project for which appellant was originally retained (the PJM project) does not change the fact that appellant's claim is based on his allegedly unlawful ouster, and the contemporaneous replacement of him with a significantly younger worker. Appellant does not allege, nor has he put forth any evidence of, a particular unlawful characteristic of the expiration of his retention period on May 31, 2003, a date to which he agreed fully six months earlier. Appellant's agreed-upon retention period is analogous to the one-year terminal contract in Ricks and to the "special assignment" agreement in Mull, and, as in those cases, the same does not operate to toll the applicable statute of limitations.[47]
 {¶ 43} For all of the foregoing reasons, we agree with the trial court that appellant's cause of action for age discrimination in violation of R.C. 4112.02 accrued on December 16, 2002, and thus was barred by the 180-day limitations period found in R.C. 4112.02(N). Accordingly, appellant's sole assignment of error is overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Brown, P.J., and Klatt, J., concur.
[1] Appellant Dep., at 93-94.
[2] May Dep. Exhibit "10".
[3] Ibid.
[4] Appellant Dep., at 98.
[5] Id. at 100.
[6] Id. at 98.
[7] Appellant Dep. Exhibit "E."
[8] Appellant Dep., at 105.
[9] Id. at 109.
[10] May Dep., at 35.
[11] Appellant Dep., at 110.
[12] Id. at 110-111.
[13] Id. at 111.
[14] May Dep., at 32-34.
[15] Appellant Dep., at 118.
[16] Ibid.
[17] Id. at 117.
[18] Ibid.
[19] Id. at 123.
[20] May Dep., at 55.
[21] Appellant Dep., at 127.
[22] Ibid.
[23] Id. at 151.
[24] Ibid.
[25] Id. at 150-151.
[26] Id. at 152.
[27] Id. at 153.
[28] Id. at 127.
[29] Ibid.
[30] Appellant Dep. Exhibit "I".
[31] Ibid.
[32] Ibid.
[33] Appellant Dep., at 134-135, 137.
[34] Id. at 138.
[35] Appellant Dep. Exhibit "J".
[36] Appellant Dep., at 140.
[37] Id. at 141.
[38] Ibid.
[39] Id. at 104.
[40] Id. at 143, 167.
[41] Complaint, at 1.
[42] Appellant's brief includes argument respecting the merits of his discrimination claim, apparently because the second branch of AEP's motion for summary judgment addressed the merits. AEP likewise addresses this issue in its brief filed with this court. However, because the trial court did not rule on the merits-based branch of AEP's motion, and because the issue is thus not presented by appellant's assignment of error, we have disregarded the merits-related arguments of the parties and decline to address the issue in this opinion. See Ochsmann v. GreatAm. Ins. Co., 10th Dist. No. 02AP-1265, 2003-Ohio-4679, ¶ 21, citingMills-Jennings, Inc. v. Dept. of Liquor Control (1982), 70 Ohio St.2d 95,99, 435 N.E.2d 407.
[43] Reply Brief of Appellant, at 1.
[44] Ibid.
[45] Reeves, supra, at 150; Coventry Twp. v. Ecker (1995),101 Ohio App.3d 38, 654 N.E.2d 1327.
[46] The court in Ricks specifically rejected the use of the final day of employment as what the court of appeals had dubbed a useful "bright line guide both for the courts and for the victims of discrimination."Delaware State College v. Ricks (1980), 449 U.S. 250, 256, 101 S.Ct. 498,66 L.Ed.2d 431, citing Ricks v. Delaware State College (C.A.3, 1979),605 F.2d 710, 712-713.
[47] The United States Supreme Court in Ricks rejected the "last day of employment" rule because it found the same to be incongruent to the facts of record and contrary to congressional intent, but also noted that such a rule could conceivably discourage employers from offering a "grace period" such as that utilized by the plaintiff in Ricks. Delaware StateCollege v. Ricks (1980), 449 U.S. 250, 260, 101 S.Ct. 498, 66 L.Ed.2d 431, n. 12. The same could certainly be said for the "retention period" in the present case. There is no evidence of record that AEP proposed the retention period for any sinister or improper purpose such as would, for example, support an argument for equitable tolling. See, e.g., Mull,
supra, at 292. On the contrary, the record reveals that the retention period accomplished precisely what appellant desired, which was to remain employed with AEP until his pension became fully vested and thus to receive a payout of $64,000 upon separation.