OPINION
{¶ 1} Plaintiff-appellant, Martin P. Sweet, appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Abbott Foods, Inc. ("Abbott Foods"), Lawrence Abbott, Jonathan Turner, David Snow, and Joseph Faccenda (collectively "defendants"). For the following reasons, we affirm.
 {¶ 2} Abbott Foods is a distributor of food service products to retail outlets, including restaurants, schools, nursing homes, and hospitals. In 1974, the then-president of Abbott Foods hired Sweet as a district sales representative ("DSR"). As a DSR, Sweet's job duties included servicing and selling to existing customers, as well as generating new customers. Sweet worked as a DSR until his employment was terminated in May 2002, when he was 55 years old.
 {¶ 3} During the majority of Sweet's tenure with Abbott Foods, Sweet was an adequate DSR and, for the most part, avoided formal censure from his supervisors. However, Sweet received written reprimands in 1982 and 1998 for insubordination, and in 1992 for verbally abusing two of his co-workers.
 {¶ 4} In 1999, Abbott Foods hired a new sales management team, who instituted changes that put pressure on the sales force to increase productivity and profitability. This management team included Turner as Vice President of Sales and Snow as Vice President of Territory Sales. Sweet reported to his District Sales Manager, Faccenda, who managed a team of ten DSRs. Faccenda reported to Snow, and Snow reported to Turner.
 {¶ 5} Before the arrival of Turner and Snow, Faccenda had criticized Sweet for lagging sales and his weakness in generating new accounts. With more pressure on the sales force, Faccenda's scrutiny of Sweet's performance increased. In the summer of 2001, Faccenda reviewed a "Salesman Progress Report" documenting Sweet's sales for the 13-week period ending June 30, 2001. According to this report, Sweet's sales were 3.44 percent below his sales for the same period the previous year and 15.18 percent below his goal for 2002. Faccenda circled the negative numbers and forwarded the report to Sweet with the comment "What are we going to do to change this next quarter?"
 {¶ 6} In addition to posting poor sales numbers, Sweet also displayed a negative attitude towards his customers and his co-workers. On September 6, 2001, Faccenda documented a conversation with Sweet in which Sweet was rude to Faccenda when Faccenda suggested that he satisfy a customer's request for a special delivery by transporting the goods himself. Sweet categorically refused to make the delivery. On September 17, 2001, Faccenda issued Sweet a written reprimand criticizing him for disrupting the August sales team meeting with sarcastic comments and for lapses in customer service. Additionally, from January to October 2001, Faccenda received complaints from Abbott Foods' Director of Customer Service, who reported that Sweet was abusive, arrogant, and rude to the customer service representatives.
 {¶ 7} In October 2001, Snow met with Sweet and gave him a written performance review in which Snow stated:
I am greatly concerned with your performance and attitude as a DSR with Abbott Foods. You are not growing your sales at an acceptable rate, given your experience and training with the company. * * *
* * *
It is evident that you are not actively working to grow your account base, as you have no new account business in July, August and September.
In order for you to continue your employment with Abbott Foods, you must meet the following criteria by January 7, 2002:
1. Your new[1] non-school sales must reach $34,000.00 per week.
2. You must open 5 new non-school accounts with average sales of $600 per week.
3. You must have no issues with the customer service or non-professional communication with anyone at Abbott Foods.
4. You are required to be a positive influence in the work place and you will refrain from negative discussions with any of the other DSR's.
 {¶ 8} The first two criteria focused on non-school sales because over 35 percent of Sweet's accounts were school accounts, when Abbott Foods wanted school accounts to only constitute 20 to 25 percent of all a DSR's accounts. A larger percentage of school accounts was undesirable because school contracts were competitively bid each year, which made the retention of school accounts unpredictable and lowered Abbott Foods' profit margins. Further, because a separate department in Abbott Foods secured the school contracts, the DSR who serviced the account was largely regulated to taking orders, although Abbott Foods encouraged its DSRs to sell "off-bid" products.
 {¶ 9} During the same meeting in which Sweet received his performance review, he signed a memorandum in which he acknowledged that his sales results were unacceptable, and he committed to spending the time and effort to raise his sales. Faccenda signed the same memorandum, acknowledging that "a concentrated effort is needed to bring [Sweet] up to Abbott Foods standards."
 {¶ 10} Shortly after this meeting, Faccenda received a telephone call from one of Sweet's larger customers, who expressed his displeasure with Sweet's graphic recounting of certain medical tests Sweet had undergone. The customer requested a different sales representative — one who "knows what's going on." Faccenda complied with this request.
 {¶ 11} Despite this incident, Sweet improved his sales numbers during the last three months of 2001. Although Sweet did not reach $34,000 in weekly non-school sales or open five new non-school accounts, his fourth quarter sales exceeded the previous year's fourth quarter sales by 3.77 percent. Due to this improvement and the effort Sweet had shown, Sweet's employment was not terminated, even though he did not meet the four criteria set out in October 2001. Rather, when Sweet met with Faccenda, Snow, and Turner in January 2002, they applauded his improved job performance. In addition, they told Sweet that they had decided to restructure his sales territory to decrease the amount of time he spent driving to call on customers and to increase the amount of time he spent generating new accounts.
 {¶ 12} Before January 2002, Sweet serviced customers in Columbus (where he lived), as well as customers located in the area south of Columbus, including Circleville, Chillicothe, Mount Sterling, Washington Courthouse, Waverly, and Jackson. This sales territory was one of the largest in Faccenda's group, and required Sweet to travel long distances to visit all his customers. With the goal of halving the distance Sweet had to drive each week, Snow and Faccenda reassigned accounts that were located farther away from Columbus. This restructuring gave Sweet two days a week to obtain new customers.
 {¶ 13} As part of the restructuring plan, Snow and Faccenda decided that Cynthia Smoke-Faccenda[2] would assume the accounts taken from Sweet. Turner had hired Smoke-Faccenda in October 2001. Initially, Smoke-Faccenda was a Product Specialist, and as such, she called on customers to demonstrate particular products Abbott Foods sold. Turner intended to use the product specialist position to groom employees to become DSRs in new sales territories. When Sweet's sales territory was restructured, Smoke-Faccenda was promoted to DSR to assume the accounts taken from Sweet because, unlike the other product specialist considered for the job, her home was located in the newly-formed sales territory. At the time she was promoted, Smoke-Faccenda was 35 years old.
 {¶ 14} To compensate Sweet for the reassigned accounts, Snow and Faccenda transferred to Sweet accounts located in Columbus and Grove City. Additionally, Abbott Foods subsidized Sweet's salary, which was based upon commissions.
 {¶ 15} Despite this compensation, the loss of the accounts demoralized Sweet, and he testified during his deposition that his job performance dwindled in 2002. In early April 2002, Faccenda met with Snow and Turner to review how well Faccenda's sales team had performed in the first quarter. During this meeting, Sweet's superiors discussed the reappearance of Sweet's old habits: his lack of productivity, his failure to open new accounts of substantial size, and his attitude problems. Although Sweet opened six new accounts in 2002, only one was of substantial size, i.e., averaging over $500 in sales a week.
 {¶ 16} Faccenda continued to monitor Sweet's performance during April, and when it remained unchanged, Faccenda recommended discharging Sweet. Nevertheless, Abbott Foods extended to Sweet one more chance. In early May 2002, Faccenda gave Sweet a letter that stated, in part, the following:
* * * As a long term DSR, Abbott Foods has been more than patient with your sales efforts. Your current numbers have put you 8% behind actual 2001 sales and 18% behind your 2002 budget. This is totally unacceptable. To reach our company goal, all DSR's are expected to produce Double Digit Growth.
In January we reduced your rural accounts, allowing you more selling time in your hometown and we maintained your current salary. This freed up at least two full days for you to open new accounts. While you have shown minor progress, the accounts you have secured are of no substantial volume. Given your tenure and experience, I have to believe you are not using the two extra days to prospect. Abbott Foods has invested time and money in training for you. We do not feel that your effort is equal to your ability.
Couple this with problems we have had in the past with you not getting along with co-workers and disrupting meetings, Abbott Foods feels that you need to make a Herculean effort by June 1, 2002 to maintain employment with us.
 {¶ 17} Faccenda testified that if Sweet had produced any new accounts of substantial volume in May 2002, he possibly could have avoided termination. However, after receiving this letter, Sweet's job performance declined even more, and on May 31, 2002, his employment was terminated. As part of processing Sweet's discharge, Faccenda completed an "Employment Termination" form in which he stated, "[t]ermination is due to failure to meet sales goals."
 {¶ 18} After Sweet left Abbott Foods, Joanne Sheehan assumed Sweet's accounts. Abbott Foods hired Sheehan to be a DSR in November 1999, and she initially covered a sales territory in the Cincinnati area. When Sheehan's husband took a job in central Ohio, she asked to be transferred to Columbus. Sheehan started working in Columbus in June 2002, when she was 29 years old.
 {¶ 19} On August 22, 2002, Sweet filed suit against Abbott Foods, Abbott, Turner, Snow, and Faccenda alleging a claim of age discrimination pursuant to R.C. 4112.02(A) and 4112.99. After extensive discovery, defendants filed a summary judgment motion, arguing that they were entitled to judgment in their favor because they articulated a legitimate, nondiscriminatory reason for Sweet's discharge, and Sweet could not prove that the reason was pretext for discrimination. Notably, in making this argument, defendants conceded that Sweet could present sufficient evidence to establish a prima facie case of age discrimination.
 {¶ 20} In addition to joining defendants' motion for summary judgment, Abbott also filed a separate motion for summary judgment. In it, he argued that he could not be liable for age discrimination as Sweet's supervisor because he did not participate in the allegedly discriminatory discharge.
 {¶ 21} In his memorandum in opposition to defendants' motion for summary judgment, Sweet maintained that genuine issues of material fact existed regarding whether defendants' proffered legitimate, nondiscriminatory reason was, in fact, pretextual. In his memorandum in opposition to Abbott's separate motion for summary judgment, Sweet argued that the evidence demonstrated that Abbott was involved in the decision to terminate Sweet, and thus, Abbott could be sued for this allegedly discriminatory act.
 {¶ 22} On October 1, 2004, the trial court issued a decision granting both defendants' and Abbott's motions for summary judgment. In its decision, the trial court agreed with defendants' arguments, finding that the evidence did not support Sweet's allegations of pretext. Also, the trial court found that Sweet's claim against Abbott failed because he was not a "decision maker" in Sweet's discharge.
 {¶ 23} The trial court reduced its October 1, 2004 decision to judgment on October 14, 2004. Sweet now appeals from that judgment.
 {¶ 24} On appeal, Sweet assigns the following errors:
[1.] THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF AGE DISCRIMINATION.
[2.] THE TRIAL COURT ERRED IN GRANTING LARRY ABBOTT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF AGE DISCRIMINATION.
 {¶ 25} By his first assignment of error, Sweet argues that he presented sufficient evidence to create a question of fact regarding whether defendants' legitimate, nondiscriminatory reason for discharging him was pretextual. We disagree.
 {¶ 26} Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd. Of Commrs. (1997),123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court."Mergenthal v. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel.Grady v. State Emp. Relations Bd. (1997), 78 Ohio St.3d 181,183.
 {¶ 27} Before addressing the merits of Sweet's argument, we must first determine whether, as Sweet argues, the case ofReeves v. Sanderson Plumbing Prods., Inc. (2000), 530 U.S. 133,120 S.Ct. 2097, requires this court to ignore all of the evidence defendants presented in support of their motion for summary judgment. In Reeves, the United States Supreme Court set out the following regarding the review of evidence submitted in support of a motion for judgment as a matter of law:
[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright Miller 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, as least to the extent that that evidence comes from disinterested witnesses." Id., at 300.
Id. at 151. Based upon this passage, Sweet contends that the trial court erred in considering any deposition or affidavit testimony from defendants' witnesses, as they are all employees of Abbott Foods, and thus, interested witnesses. We disagree for three reasons.
 {¶ 28} First, this court has previously rejected Sweet's interpretation of Reeves. Kozma v. AEP Energy Servs., Inc.,
Franklin App. No. 04AP-643, 2005-Ohio-1157, at ¶ 20. In Kozma,
we distinguished Reeves on the basis that it involved appellate review of a denial of a defendant-employer's motion for a judgment as a matter of law, not a motion for summary judgment. Second, Sweet's interpretation of Reeves is so broad that it would lead to absurd consequences. Requiring a court to disregard testimony from a company's employees regarding the company's reasons for discharging an employee would foreclose the possibility of summary judgment for employers, who almost invariably rely upon their employees' testimony to explain why the discharge occurred. Sandstad v. CB Richard Ellis, Inc.
(C.A.5, 2002), 309 F.3d 893, 898; Traylor v. Brown (C.A.7, 2002), 295 F.3d 783, 790-791. Finally, reading the passage in the context of the authority the United States Supreme Court cited for the disputed proposition, Reeves does not require the exclusion of all interested-party testimony. See Almond v. ABBIndus. Sys., Inc. (C.A.6, 2003), 56 Fed.Appx. 672, 675. Rather, pursuant to 9A Wright Miller, Federal Practice and Procedure (2 Ed. 1995) 287 fn. 9, Section 2527, "`[t]he testimony of an employee of the [movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it readily could have been shown to be so.'" {¶ 29} Despite our rejection of Sweet's reading of Reeves, we recognize that in reviewing a trial court's decision to grant summary judgment, we "must look at the evidence in a light most favorable to the non-moving party, construing all doubt in favor of that party."Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 360. Accordingly, with this in mind, we now turn to the merits of Sweet's argument that genuine issues of material fact regarding the true reasons for his discharge precluded summary judgment in defendants' favor on his age discrimination claim.
 {¶ 30} Absent direct evidence of age discrimination, a plaintiff can establish a prima facie case of age discrimination under Ohio law in an employment discharge action by demonstrating that he or she "(1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age." Coryell v. Bank OneTrust Co. N.A., 101 Ohio St.3d 175, 2004-Ohio-723, paragraph one of the syllabus. If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its discharge of the plaintiff. Barker v. Scovill, Inc. (1983),6 Ohio St.3d 146, 148; Texas Dept. of Community Affairs v. Burdine (1981),450 U.S. 248, 253, 101 S.Ct. 1089. Should the employer carry this burden, the plaintiff must then prove that the reasons the employer offered were not its true reasons, but merely a pretext for discrimination. Id.
 {¶ 31} In the case at bar, defendants concede that Sweet can establish a prima facie case of age discrimination, and thus, we turn immediately to the second step in the burden-shifting analysis: whether defendants articulated a legitimate, nondiscriminatory reason for terminating Sweet's employment. In setting forth such a reason, an employer is not required to persuade the court that it was actually motivated by the proffered reason, but rather it must merely "introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." St.Mary's Honor Ctr. v. Hicks (1993), 509 U.S. 502, 509,113 S.Ct. 2742 (emphasis sic). See, also, Reeves, supra, at 142 (relying upon Hicks in stating that an employer's satisfaction of its burden of production cannot not involve credibility determinations); Burdine, supra, at 255 (holding that an employer's burden is met if it raises a genuine issue of fact as to whether it discriminated against the plaintiff by "clearly set[ting] forth, through the introduction of evidence, the reasons for the plaintiff's rejection").
 {¶ 32} Here, Faccenda, Turner, and Snow — the three people integral to the decision to discharge Sweet — testified as to why he was discharged. Faccenda testified that he first raised the possibility of discharge because of Sweet's inability to open new accounts of substantial size, his ineffectiveness as a sales representative shown by his lack of productivity, his attitude, and his harsh treatment of consumer sales representatives. Faccenda decided to actually recommend discharge to Turner and Snow when he recognized that Sweet was not exerting any effort to increase business or open new accounts. Turner recollected that Faccenda recommended, and he ultimately agreed to, discharge Sweet because he was not "out doing the things that he needed to do to grow the business." (Tr. 108.) Snow testified similarly, stating that he endorsed Faccenda's recommendation, which was based upon Faccenda's determination that Sweet "was not giving us the effort and not turning his attitude around and was basically still at a standstill, not doing what we needed him to do." (Tr. 109.) Taken as true, this testimony would permit a trier of fact to conclude that Sweet was fired for: (1) his behavior, i.e., his poor interpersonal skills and negative attitude, and (2) his poor job performance, i.e., his lagging sales and failure to generate substantial new accounts.
 {¶ 33} Once an employer has succeeded in articulating a legitimate, nondiscriminatory reason, the burden shifting framework disappears, leaving the plaintiff with the ultimate burden of proving that the employer intentionally discriminated against him or her. Hicks, supra, at 510-511; Reeves, supra, at 142-143. A plaintiff satisfies this burden by presenting evidence from which a jury could conclude that the employer's proffered reason was false, and that discrimination was the real reason for discharge. Hicks, supra, at 515. "In other words, `[i]t is not enough * * * to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" Reeves, supra, at 147, quotingHicks, supra, at 519 (emphasis sic).
 {¶ 34} In order to carry this burden, a plaintiff must rely upon evidence that proves either "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." Manzer v. Diamond ShamrockChems. Co. (C.A.6, 1994), 29 F.3d 1078, 1084. See, also,Ullmann v. State, Franklin App. No. 03AP-184, 2004-Ohio-1622, at ¶ 13, 27-39 (applying Manzer); Ricker v. John Deere Ins.Co. (1998), 133 Ohio App.3d 759, 772-773 (same). The first type of showing "consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are `factually false.'" Manzer, supra, at 1084, quoting Andersonv. Baxter Healthcare Corp. (C.A.7, 1994), 13 F.3d 1120,1123-1124. The third type of showing "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Id. Thus, the first and third types of showings directly attack the credibility of an employer's proffered reasons, and together with evidence proving a plaintiff's prima facie case, each permit the trier of fact to find that the employer unlawfully discriminated.
 {¶ 35} Unlike the first and third types of showings, when a plaintiff presents the type of evidence described in the second showing, he does not attack the factual basis underlying the employer's proffered reason, but instead, admits that such conduct could motivate dismissal. Id. To indict the credibility of his employer's explanation, the plaintiff introduces evidence that "tend[s] to prove that an illegal motivation was more
likely than that offered by the defendant." Id. (Emphasis sic). In other words, the plaintiff presents circumstantial evidence to prove that it is "more likely than not" that the employer's explanation is a pretext. Id.
 {¶ 36} Although decided before Reeves clarified the plaintiff's final burden in proving an indirect case of age discrimination, Manzer is consistent with Reeves. See Petersv. Lincoln Elec. Co. (C.A.6, 2002), 285 F.3d 456, 471-472; Grayv. Toshiba Am. Consumer Prods., Inc. (C.A.6, 2001),263 F.3d 595, 600-602; Weller v. Titanium Metals Corp. (S.D.Ohio 2005),361 F.Supp.2d 712, 720-723 (discussing Ohio law). In Reeves,
the United States Supreme Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148. Thus, as the Sixth Circuit in Manzer had already held, the United States Supreme Court in Reeves concluded that a plaintiff can carry its ultimate burden of proving discrimination by introducing evidence establishing both his prima facie case and the incredibility of the employer's proffered reason.
 {¶ 37} Unlike Manzer, however, Reeves also recognized that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Id. Reeves
offered the following examples of such instances: "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Id.
 {¶ 38} In the case at bar, Sweet primarily argues that he established defendants' reason for discharging him was pretextual by presenting the type of evidence contemplated in the thirdManzer showing, i.e., evidence that his actions were insufficient to motivate discharge because similarly-situated employees were not also discharged. To be similarly situated, a non-protected co-worker "[m]ust have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Hapner v. TuesdayMorning, Inc., Montgomery App. No. 19395, 2003-Ohio-781, at ¶ 118, quoting Ercegovich v. Goodyear Tire Rubber Co. (C.A.6, 1998), 154 F.3d 344.
 {¶ 39} Here, Sweet compares himself to four individuals — Faccenda, Joel Johnson, Smoke-Faccenda, and Sheehan. First, he asserts that Faccenda was not performing to expectations during 2000, but Abbott Foods retained him and increased his base pay by $5,000. Faccenda, however, is not similarly situated to Sweet as he is a district sales manager, whereas Sweet was a DSR. Further, even if Faccenda held the same position as Sweet, we could not conclude he was similarly situated because Sweet presented no evidence specifying Faccenda's deficient conduct. To support his assertion that Faccenda was not performing to expectations, Sweet presented only a September 10, 2000 e-mail from Abbott to Turner stating that "Joe's performance over the last year has been far less the [sic] spectacular." From this statement alone, it is impossible to determine whether Faccenda's performance issues were the same as those that led to Sweet's discharge.
 {¶ 40} Second, Sweet asserts that Johnson, another DSR in Sweet's group, only increased his 2001 sales 3.3 percent over 2000 and his performance was considered "good," while Sweet increased his 2001 sales 4.6 percent over 2000 and his performance was considered "ok." In making this comparison, Sweet relies upon evaluations contained in a November 2001 memorandum prepared for Turner, Snow, and Faccenda's review of the third quarter 2001 results. Although Sweet received a lower subjective rating than Johnson, Snow explained that the evaluations were based upon more than mere numbers. Johnson's sales were rated "good" because he had lost two large accounts in the first quarter, and yet, he raised his sales numbers in both the second and third quarters through generating new business. Further, Johnson's ability to increase sales over the previous year was even more impressive than Sweet's because Johnson's volume of sales was twice the amount of Sweet's volume. Thus, the differences in Johnson's and Sweet's performance not only explained the differences in their evaluations, but shows why they are not similarly situated.
 {¶ 41} Third, Sweet asserts that Smoke-Faccenda did not make her sales goals and her accounts included a large percentage of school accounts, yet she was not discharged. Although Smoke-Faccenda's performance suffered in two respects, she is not similarly situated to Sweet because she succeeded in ways Sweet did not, even though she had less experience than Sweet. First, unlike Sweet, whose 2002 sales numbers were below goal and the previous year's numbers, Smoke-Faccenda's 2002 sales exceeded the 2001 sales for her territory by 10.68 percent. Additionally, Sweet presented no evidence that Smoke-Faccenda displayed the same difficulties with attitude and interpersonal relations that Sweet had. Finally, the end of 2002 marked Smoke-Faccenda's first year as a DSR, while Sweet had been a DSR for over two decades when he was discharged.
 {¶ 42} Fourth, Sweet asserts that Sheehan did not open a large amount of new accounts, yet she was not discharged. However, Sheehan is also not similarly situated to Sweet. Sweet presents no evidence that Sheehan's sales numbers fell below expectation or the previous year's sales numbers, as his did in 2002. Further, Sweet presents no evidence that Sheehan displayed poor interpersonal skills or a negative attitude, as Sweet did. Finally, like Smoke-Faccenda, Sheehan had much less experience as a DSR than Sweet, and no experience in the Columbus market.
 {¶ 43} Given the foregoing, we conclude that Sweet failed to show defendants' proffered reason for discharging Sweet was pretextual through the third type of Manzer showing.
 {¶ 44} In addition to asserting defendants' proffered reason was insufficient to motivate his discharge, Sweet also asserts that defendants' proffered reason did not actually motivate his discharge. To support this assertion, Sweet must provide the type of evidence contemplated by the second Manzer showing, i.e., circumstantial evidence to prove that it is "more likely than not" that defendants' explanation is a pretext. First, Sweet points to evidence that the "behavioral" incidents described in the record all occurred at least seven months prior to his discharge. Sweet contends that the age of these incidents is proof that defendants did not really rely upon these incidents as a reason to discharge him. However, we find, as the court inManzer did, that this argument is misdirected. An argument that an employer waited before discharging an employee is "precisely the type of `just cause' argument which must not be allowed to creep into an employment discrimination lawsuit." Manzer,
supra, at 1085. See, also, Ullmann, supra, at ¶ 39, quotingElrod v. Sears, Roebuck Co. (C.A.11, 1991), 939 F.2d 1466,1470 (stating that "courts do not sit as a `super-personnel department that reexamines an entity's business decisions'"). Further, this argument addresses only one component of the proffered reason given for Sweet's discharge. Sweet must prove both components are unworthy of credence as Sweet's superiors decided to discharge Sweet based upon bad behavior in combination with his failure to increase sales and open new accounts. SeeRicker, supra, at 773.
 {¶ 45} Second, Sweet argues that the advent of Smoke-Faccenda's hiring so close to the date his sales territory was restructured demonstrates that defendants' real purpose in restructuring his territory was to replace him with a younger DSR. As we stated above, Smoke-Faccenda was hired in October 2001 as a product specialist and promoted to DSR in January 2002 to take over a part of the territory Sweet had previously covered. Contrary to Sweet's speculation about defendants' purpose in hiring Smoke-Faccenda, Turner explicitly testified that he hired her to become a DSR in new sales territory, and not to replace a DSR in existing sales territory. Moreover, both Turner and Snow testified that they did not even discuss the possibility of Smoke-Faccenda taking over part of Sweet's territory while making the decision to hire her.
 {¶ 46} Similarly, Sweet also argues that Sheehan's move to Columbus so close to the date of his discharge demonstrates that defendants' real purpose in discharging him was to replace him with a younger DSR. However, Sweet presents no evidence, such as the date on which Sheehan requested a transfer or moved to Columbus, to support this hypothesis. Moreover, Sheehan testified that her request was motivated by the location of her husband's new job, not an imminent vacancy in a DSR position in Columbus.
 {¶ 47} Third, Sweet argues that defendants' actual motive in restructuring his accounts was to drive down his sales and ability to generate new business so that they would have grounds to discharge him. Again, however, the evidence shows otherwise. Snow, Turner, and Faccenda all stated that the restructuring actually gave Sweet two days to devote solely to opening new accounts — a generous amount of time for a DSR. Although Sweet retained some outlying accounts that required him to travel, he does not dispute that he gained additional time to prospect for new customers. Further, despite Sweet's claim that the restructuring "bludgeoned" his support system, defendants did not relegate Sweet to unfamiliar territory, but merely decreased the amount of territory he was covering. Sweet may have been demoralized by the changes to his territory, but he presents no evidence that defendants harmed his ability to generate new customers in his restructured territory. Additionally, we note that defendants did not have to restructure Sweet's territory in order to have grounds on which to discharge him. Because Sweet failed to meet two of the four criteria contained in the October 2001 memorandum, defendants had grounds to terminate his employment on January 7, 2002, before the restructuring plan was instituted.
 {¶ 48} Fourth, Sweet argues that defendants' reason for discharging him changed, thus calling into question whether the reason given actually motivated Sweet's discharge. Shifting justifications for discharging an employee can call the credibility of those justifications into question. Cicero v.Borg-Warner Automotive, Inc. (C.A.6, 2002), 280 F.3d 579, 592. Here, however, the evidence does not demonstrate defendants altered their explanation for discharging Sweet. As demonstrated by the content of the October 2001 performance review and the May 2002 letter, defendants repeatedly expressed their disapproval of Sweet's poor job performance and behavior, and they threatened to discharge him if he did not improve both. Although Faccenda only stated one part of the reason in the "Employment Termination" form — failure to meet sales goals — he articulated a full explanation in his deposition. Likewise, Snow and Turner each stated in their depositions that Sweet was discharged because of a combination of poor performance and behavior.
 {¶ 49} Fifth, Sweet argues that defendants' deviation from normal company procedure for disciplining an employee demonstrated that defendants' true motivation for discharging him was to replace him with a younger DSR. We agree that evidence that an employer short-circuited company policy when discharging an employee could potentially show that the employer's proffered reasons did not actually motivate the discharge. However, such evidence is not presented here. Rather, any deviation from normal procedure was in Sweet's favor as defendants extended to Sweet every opportunity to improve. Although informal, Abbott Foods' policy mandates that a failing DSR be given verbal warnings, and then a written "write-up" requiring certain action by a specified date. If a DSR does not perform the required action, then he or she is discharged. Even though Sweet did not meet the criteria stated in the October 2001 "write-up" by the set deadline, Faccenda deviated from policy and retained Sweet because he was showing effort and improving his sales numbers. Then, instead of discharging him in early May 2002, defendants gave Sweet one, final chance to produce a "Herculean effort." Sweet, admittedly, did not make such an effort.
 {¶ 50} Given the foregoing, we conclude that Sweet failed to show defendants' proffered reason for discharging him was pretextual through the second type of Manzer showing. Accordingly, we overrule Sweet's first assignment of error.
 {¶ 51} By Sweet's second assignment of error, he argues that the trial court erred in granting Abbott's separate motion for summary judgment on the basis that he was not involved in the discharge determination. As we have concluded that Sweet cannot prevail on his age discrimination claim against any of the defendants, including Abbott, we conclude that Sweet's second assignment of error is moot.
 {¶ 52} For the foregoing reasons, we overrule Sweet's first assignment of error and overrule as moot Sweet's second assignment of error. Therefore, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Brown, P.J., and French, J., concur.
[1] The parties do not dispute that the insertion of the word "new" was a typographical error, and that in reality, the first criteria was to reach $34,000 in non-school sales.
[2] Smoke-Faccenda is now married to Faccenda. The Faccendas' romantic relationship began in spring 2002, after she was promoted.