**Casell RANDLE, George Austin and Holmes Communications, Plaintiffs,**

v.

**LaSALLE TELECOMMUNICATIONS, INC., d/b/a Chicago Cable TV, Defendant.**

**No. 86 C 3290.**

United States District Court, N.D. Illinois, E.D.

Oct. 14, 1988.

Robert Pincham and Anthony DiVincenzo, Chicago, Ill., for plaintiffs.

James Betke, Julie Badel, McDermott, Will & Emery, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

The plaintiffs, Holmes Communications (HC), Casell Randle and George Austin, brought this action against the defendant LaSalle Telecommunications, Inc., d/b/a Chicago Cable TV (LaSalle), alleging claims under 42 U.S.C. sec. 1981 and pendent state claims for breach of contract. LaSalle has moved for summary judgment on all of the claims. *See* Fed.R.Civ.P. 56(c).

### I

On 16 March 1984, LaSalle entered into an agreement with the City of Chicago. The City granted LaSalle a franchise "to construct, install, maintain and operate a cable television system" within a specified section of Chicago. Para. 2.1. Among the terms and conditions in the franchise agreement are two relating to minority business enterprises (MBEs) and women's business enterprises (WBEs), which obligate LaSalle to use its "best efforts" to ensure that MBEs receive 25% and WBEs 5% of the total dollar value of the contracts LaSalle awarded in exercising its franchise. Franchise Agreement, paras. 25.2 and 25.3. Enter Holmes Communications.

Robin Holmes, a black woman, owned HC, which was therefore an MBE and a WBE; she began HC in 1986 with approximately $8,000. While she was preparing to establish HC during 1985 she was also employed as a sales supervisor by Group W, a cable television operator. She wanted to work at Group W for at least one year "for resume fodder." Group W management was aware of this and believed she was there solely to disrupt and steal its sales force. While employed there Holmes learned that Group W had a policy of prohibiting its employees from working at another sales position at the same time. (Austin and Randle also were aware of this policy.)

In preparation to start her own business Holmes met several times with LaSalle representatives, and held discussions with Austin (while he was employed by Group W) about coming to work for her incipient company. The meetings with LaSalle resulted in a contract: HC would market LaSalle's cable service in areas specified by LaSalle in return for a commission on the sales. HC started selling cable subscriptions for LaSalle in January of 1986.

Austin and Randle started selling cable for HC while still employed by Group W, in violation of Group W's policy. When confronted with the fact, both lied. And both were fired.

Holmes, as well as Austin and Randle, also was aware that Group W and LaSalle had "an understanding or agreement" that people who left Group W for greener pastures could not work for another cable company for 60 days. Holmes was unfazed; and on behalf of HC she hired several Group W salesmen (including Austin and Randle) despite the fact they were still employed by Group W. And at some point after Group W fired Austin and Randle, a LaSalle representative "reminded" Holmes of Group W's 60-day policy and "suggested" that "it would be a good idea" if HC laid them off for 60 days. Holmes was persuaded; she felt it was in HC's best interests to send Randle and Austin packing for two months: LaSalle was paying HC's invoices much faster than it was contractually obligated to; and Holmes believed that if she did not lay off Randle and Austin the turnaround time on payment would increase; this in turn would jeopardize her nascent business by creating serious cash-flow problems. The payment period was so important to HC's continued survival that Holmes, in a subsequent contract modification, agreed to accept a reduced commission on certain cable subscription packages in return for quicker payment.

Worse came to worse, however, and by August of 1986 HC had been locked out of its office for failing to pay the rent. Holmes "threw in the sponge and went into seclusion * * *." On 5 August 1986 LaSalle, unaware of HC's difficulties, notified Holmes by letter that it was concerned that HC was not fulfilling its part of the contract: a number of HC salesmen had approached LaSalle for jobs claiming that they had not been paid for as many as four weeks, and HC had picked up only one sale out of approximately 40 leads; hardly indicia of a thriving business. The letter concluded that if Holmes did not respond to these concerns by the morning of August 7, LaSalle would reissue the sales routes it had previously assigned to HC.

Holmes, of course, never received the letter. After being locked out of the office she did not even try to pick up the mail. Having received no response, LaSalle sent Holmes a second letter on August 8; this one declaring that the contract terminated due to HC's "default." Holmes never received this letter either. The plaintiffs claim they were the victims of invidious race discrimination.

## II

The plaintiffs allege four specific acts of discrimination: (1) LaSalle forced Holmes to terminate Randle and Austin for 60 days, (2) LaSalle unilaterally reduced HC's commission amount, (3) LaSalle arbitrarily limited the territories HC could work, and (4) LaSalle improperly terminated its contract with HC.

### A

■ To prevail under sec. 1981[1], a plaintiff must show he is the victim of intention-

---

**1.** In *Runyon v. McCrary,* 427 U.S. 160, 168–75, 96 S.Ct. 2586, 2593–97, 49 L.Ed.2d 415 (1976), the Supreme Court construed sec. 1981 to prohibit racial discrimination in the making and enforcement of private contracts. The Court has recently agreed to reconsider *Runyon's* interpretation of sec. 1981, *see Patterson v. Mc-Lean Credit Union,* — U.S. —, 108 S.Ct. 1419,

99 L.Ed.2d 879 (1988), which could spell trouble for the plaintiffs. Depending on the Court's answer to this question it could end the plaintiffs' quest for relief in federal court because the only basis for federal jurisdiction is their sec. 1981 claim, which centers on private contracts which in turn may stand on shaky statutory legs in light of *Patterson.* Because we conclude that

al discrimination. *Friedel v. City of Madison*, 832 F.2d 965, 972 (7th Cir.1987). And he may do so by direct or indirect proof. *Id.* LaSalle argues that the plaintiffs cannot establish a prima facie case of discrimination under the shifting-burdens-of-production method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and that even if they could, LaSalle could articulate legitimate nondiscriminatory reasons for its actions which the plaintiffs could not show to be pretextual. The plaintiffs do not quarrel with LaSalle's position. Rather, they maintain that they have direct evidence of discrimination; and that the *McDonnell Douglas* test applies only when a plaintiff attempts to prove discrimination through indirect methods of proof. See *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. * * * The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff [has] his day in court despite the unavailability of direct evidence."). *See also Fields v. Clark University*, 817 F.2d 931, 935 (1st Cir.1987); *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1549 (10th Cir.1987); *Sims v. Cleland*, 813 F.2d 790, 794 (6th Cir.1987); *McCarthney v. Griffin–Spald-*

*ing County Bd. of Ed.*, 791 F.2d 1549, 1553 (11th Cir.1986); *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 130 (3d Cir.1985), *aff'd*, —— U.S. ——, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). *But see Abasiekong v. City of Shelby*, 744 F.2d 1055, 1058 (4th Cir.1984) (burden of persuasion remained with plaintiff who introduced evidence of racially offensive remarks directed at him by the decisionmaker); *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1138 (4th Cir.1988). We find it unnecessary to decide what method of proof is applicable in direct evidence cases, however, because we are convinced that the plaintiffs have not produced direct evidence of discrimination.[2]

Direct evidence is "proof which speaks directly to the issue, requiring no support by other evidence." *Black's Law Dictionary* 413 (5th ed. 1979). It "directly proves a fact, without an inference or presumption[3]; and which, if true, conclusively establishes that fact." *Id.* See also *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir.1985) (where "direct" evidence is offered "no inference is required."); *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1549 (10th Cir.1987) (discriminatory statements were not direct evidence because they did not relate to the particular employment decisions at issue and thus required an inference). For purposes of

---

the plaintiffs have no sec. 1981 claim, we think it would be a waste of time to keep this case in limbo pending the Court's decision in *Patterson*.

**2.** Some courts have held that if the plaintiff offers direct evidence of discrimination which, if believed, would establish a violation, the burden of persuasion shifts to the defendant to show that the same decision would have been reached absent the improper motive. *See, e.g., Hopkins v. Price Waterhouse*, 825 F.2d 458, 470–71 (D.C.Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988); *Fields v. Clark University*, 817 F.2d 931, 935 (1st Cir.1987); *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 712 (6th Cir.1985).

**3.** It is not quite accurate to describe direct evidence as that which proves a fact "without an inference or presumption." Wigmore's example is that W testifies at D's murder trial that W saw D kill H. ("I saw D kill H.") The trier of fact, assuming he believes W, can make only one *inference*, but an inference just the same: that D *did* kill H. The evidence is direct because of its

relationship to the proposed conclusion. Either the trier of fact believes it, in which case he must affirm the proposed conclusion (D did kill H), or he does not believe it, in which case he will not affirm the proposed conclusion. Direct evidence, then, is proof "which is consistent only with either the proposed conclusion or its contradictory;" *Wigmore on Evidence* sec. 24 n. 5 at 948–49. Although an inference is involved, "[t]he inferential process here is so simple that the presence of the inference is not apparent." *Id.*

Circumstantial evidence, on the other hand, will support two inferences: the proposed conclusion and its contradictory. Even if believed, circumstantial evidence is consistent with the proposed conclusion and its contradictory. *See also McCormick on Evidence* sec. 185 (3d ed. 1984) ("The characterization of evidence as 'direct' or 'circumstantial' points to the kind of inference which is sought to be drawn from the evidence to the truth of the proposition for which it is offered").

determining whether the *McDonnell Douglas* test applies, evidence is direct if (1) it speaks directly to the issue of discrimination, and (2) it concerns the specific employment decisions in question. Neither is a sufficient condition; both are necessary.

■ Here the plaintiffs point to a number of racial slurs allegedly made by LaSalle personnel. There is deposition testimony, for example, that Bruce Ellis, LaSalle's general manager, stated in a meeting that "if he had his way he wouldn't deal with any [women or blacks]." Holmes Dep. at 129. On another occasion Ellis observed that the way "things were going, [LaSalle] would soon be all black." Hernandez Aff. para. 8. The plaintiffs contend that "[t]his is certainly direct evidence of racial bias." Plaintiffs' Resp. at 10. And so it may be. But it is not direct evidence of racial bias with respect *to HC.* These remarks, while racially repugnant, do not directly establish that LaSalle discriminated against HC; at most, they show that Ellis, an apparent decisionmaker at LaSalle, harbored racially offensive attitudes; and in order for the plaintiffs' theory to succeed the trier of fact must make the further inference that his attitudes led him to discriminate against HC. This is not direct evidence.

■ The next item of direct evidence is that LaSalle "purposefully hired whites to work in white areas to the exclusion of blacks." Plaintiffs' Resp. at 10. *See* the Memorandum from Maria Diaz to Joe Hernandez, dated March 12, 1986. This evidence, like Ellis's comments, is circumstantial: it requires the fact-finder to infer the proposed conclusion that LaSalle discriminated against HC from the fact that LaSalle treated its own employees discriminatorily. The same holds true of the plaintiffs' evidence that William Gerski, LaSalle's marketing manager, made derogatory statements about a black woman (not Holmes), and that Ellis resisted black employees' efforts to establish Martin Luther King's birthday as a company holiday.

Finally, the plaintiffs advert to evidence that Ellis and other LaSalle officers had "reached a consensus that steps would be taken to ensure that [MBEs and WBEs] would not receive a fair share of the economic benefits of the Franchise Agreement * * * ", Hernandez Aff. paras. 5–6, and that LaSalle treated its own minority employees discriminatorily. *See* Hernandez Aff., Ex. 2. The latter is not direct evidence that HC (or Randle or Austin) was the victim of race discrimination; and the former does not satisfy the first condition: it does not establish race discrimination. For all we know, LaSalle may have decided to sever MBEs and WBEs for reasons of profit rather than race. *See infra* at 1481–82.

In sum, we find that the plaintiffs' proposed evidence of discrimination is not direct; and the *McDonnell Douglas* test applies.

**B**

All of this does not mean that LaSalle is entitled to summary judgment. It simply means we are back at square one: LaSalle must establish that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c). It can do this if the plaintiffs are unable to make a showing sufficient to prove an essential element of a claim on which they bear the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Common v. Williams,* 859 F.2d 467, 469–70 (7th Cir.1988). The plaintiffs, in order to prevail at trial, must prove that they have been victims of intentional race discrimination. As with negligence, discrimination "in the air, so to speak, will not do." F. Pollock, *Laws of Torts* 468 (13th ed. 1920). And so we come back to the alleged four acts of discrimination: (1) LaSalle forced Holmes to fire Randle and Austin for 60 days; (2) LaSalle unilaterally reduced Holmes's commission; (3) LaSalle arbitrarily limited the territories it assigned to Holmes and failed to assign white territories to black salesmen; and (4), LaSalle improperly terminated its contract with HC. We examine each in turn.

1

LaSalle argues that it is not responsible for the 60–day layoffs of Randle and Austin; but more importantly it points out that there is no evidence that either of these salesmen was the victim of race discrimination. Although Robin Holmes was aware (as were Randle and Austin) that Group W and LaSalle had an understanding that employees who left Group W could not work for another cable company for 60 days, she hired a number of salesmen from Group W in violation of that policy anyway. Holmes Dep. at 60–61, 63, 66–69.

 Holmes testified at her deposition that Gerski, Ellis and one other unnamed LaSalle employee told her "it would be a good idea if [she] let [Randle and Austin] go." *Id.* at 74. She believed that if she did so, LaSalle would continue to pay her invoices "in an expedient manner." *Id.* She "understood" that if LaSalle was to continue doing her this "favor" (paying HC's invoices faster than it was contractually obligated to do so), she would have to do this "favor" (letting Randle and Austin go) for LaSalle.[4] *Id.* She went ahead and terminated Randle and Austin "in the best interests of Holmes Communications." *Id.* at 75. Holmes could have refused to fire Randle and Austin. Refusing may have meant that LaSalle would pay HC within 60 days rather than 10; but LaSalle's contractual obligation specified 60 days, and it is hardly improper to perform in accordance with one's voluntarily assumed obligations. Her choice was not coerced in the legal sense. Coercion means compulsion by force of arms or threat; it is not returning favor for favor (a favor is an act of regard for another).

 Holmes also testified that Group W never took any action regarding other Group W employees—including blacks, *see* Austin Dep. at 79—employed by HC in violation of the 60–day policy. According to Holmes, Randle and Austin were singled

out because "not only were they the heavy hitters [for HC], but they were heavy hitters at Group W [too]", *id.* at 83, and because Group W wanted to get back at her for resigning, *id.* at 87. Austin testified that the 60–day policy was intended to put Holmes out of business because "of the type of guys that Cass Randle and I are. * * * [W]e get out and get production." Austin Dep. at 78–79.[5] While this testimony hardly sheds forgiving light on Group W, by no stretch of the imagination does it permit (let along require) an inference that LaSalle forced Robin Holmes to fire Randle and Austin for racial reasons. In fact the plaintiffs' testimony leads to the opposite conclusion: their terminations were motivated by avarice and Group W's personal animosity toward Robin Holmes.

 The only evidence that the plaintiffs offer in response is the so-called "direct" evidence described in sec. A. The problem with this evidence (in addition to the fact that it is not "direct") is that it does not create a genuine issue of material fact regarding the 60–day terminations of Randle and Austin. The plaintiffs as well as Holmes testified specifically that the terminations resulted from concerns other than race; given this testimony, which speaks directly to the employment decisions at issue here, we will not strain to find material facts based on generalized discrimination floating in the LaSalle ether. *See Hopkins v. Price Waterhouse*, 825 F.2d 458, 478 (D.C.Cir.1987) (Williams, J. dissenting), *cert. granted*, —— U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988).

2

 The plaintiffs' second alleged act of discrimination, that LaSalle unilaterally reduced HC's commissions, is the stuff of which sanctions are made. As executed, the LaSalle–HC contract required LaSalle to pay HC's commissions within 60 days after receipt of an invoice. LaSalle–HC

---

**4.** LaSalle contends that it was merely relaying a message for Group W.

**5.** Austin did testify that he believed the 60–day policy was racially motivated because it affected only blacks. This testimony, however, is enti-

tled to no weight in light of his subsequent testimony that the policy was used to stop Randle and Austin from working to put Holmes out of business, not because they were black.

Agreement para. 3(c). In fact, however, LaSalle was paying the invoices much faster than this, sometimes within 24 hours. Holmes Dep. at 76–77. HC needed quick payment in order to stay above water, and LaSalle accommodated.

LaSalle and HC subsequently executed an amendment to their contract. The amendment provided that LaSalle would pay HC within 10 days instead of 60; and HC agreed to reduce its commission for "target packages" (packages which LaSalle preferred to sell) from $30 to $25. Holmes signed the amendment on behalf of HC. This is hardly unilateral action. We find it incredible that HC argues that it was the victim of ex parte conduct when its president signed the amendment which cemented the modification. This allegation is not only meritless it comes perilously close to violating Rule 11. Presumably the plaintiffs once again rely on the evidence of the brooding omnipresence of discrimination in the LaSalle atmosphere; but such evidence is insufficient in light of the fact that the commission rate modification was the subject of a bargained-for exchange between LaSalle and HC.

### 3

█ Next in the list of discriminatory acts is that LaSalle arbitrarily limited the territories it assigned to HC and failed to assign HC territory in white neighborhoods. Acting arbitrarily is not the same as acting discriminatorily. To act arbitrarily is to act without reason or determining principle,[6] *Black's Law Dictionary* 96 (5th ed. 1979); to act discriminatorily, on the other hand, is to act with a reason, according to a determining principle:[7] to treat a person (or other juridical entity) differently on the basis of irrelevant characteristics such as race or religion. To say that one has acted arbitrarily is also to say that he has not acted discriminatorily. The concepts are mutually exclusive.

█ We are also persuaded that the plaintiffs are not entitled to go to trial on the allegation that LaSalle discriminated against them by failing to assign them white neighborhoods. A preliminary point here is that Randle and Austin have no cause of action because HC, not LaSalle, assigned them their territories. LaSalle had a contractual obligation to provide territories to HC, not Randle and Austin. Absent a claim that they are third-party beneficiaries to the LaSalle–HC agreement, which they do not make, Randle and Austin have no right to work white territories (assuming HC does), and therefore cannot sue for breach of such a duty.[8]

Turning to HC, we have no trouble concluding that it has no claim against LaSalle for failing to assign it "white" territory. Our basis: Holmes's deposition testimony. She conceded that LaSalle did assign HC white neighborhoods, indeed *too much* white territory. Holmes Dep. at 170. "Too much" because white neighborhoods are (apparently in Holmes's view) higher income areas, and higher income areas are not as fertile for cable cultivation. *Id.* Randle and Austin both testified that they sold in black and white neighborhoods. Randle Dep. at 56; Austin Dep. at 42–44. Where is the evidence of race discrimination? Other than the general evidence that LaSalle personnel harbored racially offensive attitudes, which is insufficient to rebut specific evidence, there is nothing. True, Holmes did testify that she believed (on the basis of observations she made while driving in her automobile) that HC was being given second choice in territories; and that

**6.** This of course assumes that the discrimination must be intentional, which, as we noted above, is true of sec. 1981 actions. *See supra* at 1479–80.

**7.** Even in the constitutional law context "arbitrary" refers to the contradictory of giving reasons. For example, if legislation is enacted which does not impinge on a suspect classification (such as race), it must be "rationally related" to the end sought to be achieved. *Kadrmas v. Dickinson Public Schools*, —— U.S. ——, 108

S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988). "Rationally related" means that there is some reason for believing that the legislation will achieve its purpose. In other words, that it is not arbitrary.

**8.** Without attempting to gild the lily, we note that Holmes testified that *she* assigned territories to HC salesmen on the basis of race. Holmes Dep. at 103.

LaSalle was squeezing HC out of the contract.[9] But she attributed the squeeze to the fact that LaSalle could sell cable more efficiently and cheaply through its in-house sales staff, rather than through HC. Holmes Dep. at 112. The proof is in the pudding. There is no evidence to establish that LaSalle's assignment of territories to HC was motivated by racial considerations, therefore this allegation collapses.

4

■ The final act of alleged discrimination is that LaSalle improperly terminated its contract with Holmes. The LaSalle–HC contract provides that either party could terminate it on 30 days' written notice informing the other of the reasons for the action; only 3 days' written notice was required if either party became "insolvent or bankrupt", see para. 2.

On 5 August 1986 Peter Jenkins, LaSalle's sales manager, sent Holmes a letter informing her that LaSalle had attempted without success to reach her the previous two days; it also notified her that LaSalle was ready to issue HC more sales territory (if HC had worked the areas already issued), but LaSalle was concerned that HC was in trouble because leads were not ripening into sales, and HC's salesmen had come to LaSalle looking for work and claiming that they had not been paid for as many as four weeks. Accordingly, Jenkins notified her that if she did not respond to the letter by August 7 LaSalle would re-issue the sales routes previously assigned to HC.

Unknown to LaSalle, HC was already out of business: it was locked out of its office for failing to pay rent; and Robin Holmes "threw in the sponge and went into seclusion." Holmes Dep. at 95, 165–66. She did not receive the letter; she did not even attempt to get HC's mail at the office. Id. at 166. Of course there was no response to LaSalle's letter. And on August 8 LaSalle sent another letter notifying HC that their contract was terminated because HC was in "default."

We believe that LaSalle's action was proper under either of the contract termination provisions. HC was insolvent: it was unable to pay its debts as they came due. See, e.g., U.C.C. sec. 1–201(23). (HC also probably was insolvent under federal bankruptcy law, see 11 U.S.C. sec. 101(31), because the sum of its debts exceeded the fair value of its property: it had virtually no assets and substantial debt in the form of rent and salaries. See Holmes Dep. at 90–91, 95, 97.) HC was entitled to 3 days' written notice; and 3 days' written notice it got: LaSalle informed HC of its concerns on August 5 and terminated the contract on August 8.

The contract termination also was proper under the default provision. HC was obligated under the contract "to promote [LaSalle's] [s]ervice and to solicit subscriptions to [s]ervice * * * with reasonable diligence * * *." Para. 1. The undisputed evidence establishes that as of 5 August 1986 HC was not fulfilling its obligation. At that point LaSalle was entitled to terminate the contract on 24 hours' notice; it gave 72.

■ HC's response to all of this is that LaSalle is responsible for its insolvency; that LaSalle cut off HC's financial lifeline by slowly depriving it of territories to work. Holmes Dep. at 98–99, 102. Even assuming this is true, however, it does not follow that LaSalle did so for racial reasons; which brings us back to Holmes's testimony that LaSalle wanted HC out of the picture because LaSalle could sell cable subscriptions itself at a greater profit. Id. at 112. This is not race discrimination.

III

Even assuming the plaintiffs could establish a prima facie case with respect to each of the alleged acts of race discrimination, LaSalle has articulated legitimate, nondiscriminatory reasons for its action; and the plaintiffs have failed to provide evidence sufficient to create a genuine issue of ma-

**9.** Randle testified that he had conversations with LaSalle salesmen (whose name he could not remember) who told him they were receiving better areas. This testimony is inadmissible because it lacks a foundation; and therefore we cannot consider it. See Fed.R.Civ.P. 56(e).

terial fact that LaSalle's reasons are a pretext for discrimination. The plaintiffs' sec. 1981 action is therefore dismissed. And since the sec. 1981 action provides the only basis for federal jurisdiction, the plaintiffs' pendent state law claims must be dismissed for want of subject matter jurisdiction. *Argento v. Village of Melrose Park*, 838 F.2d 1483, 1491 (7th Cir.1988).