OPINION
{¶ 1} Plaintiff-appellant, Lisa Thompson ("Thompson"), appeals from the judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Gynecologic Oncology Pelvic Surgery Associates ("GOPSA"), on Thompson's claims of wrongful discharge in violation of public policy. For the following reasons, we affirm.
 {¶ 2} From October 4, 2000, through February 23, 2001, GOPSA employed Thompson as a medical assistant. During Thompson's employment, Drs. George Lewandowski and Luis Vaccarello were shareholders and employees of GOPSA. Other GOPSA staff included office manager Judy Kempe, receptionist Denise Yee, and registered nurse Kim Elling. Dr. Rene Caputo worked out of GOPSA's offices as an employee of Urogynecology and Pelvic Floor Specialists, Inc. ("UPFS"), which also employed registered nurse Inna Dulkin. Although not employed by either GOPSA or UPFS, research nurse Beth Graham worked out of GOPSA's offices, meeting with GOPSA patients regarding clinical trials.
 {¶ 3} In accordance with GOPSA policy, Thompson's employment was subject to a 90-day probationary period. At her deposition, Thompson initially stated that she was unaware of any conflicts between herself and other staff members during her probationary period, but Thompson's subsequent deposition testimony regarding conflicts with both Dulkin and Yee during her probationary period belies that contention.
 {¶ 4} Thompson's conflict with Dulkin revolved, in part, around Dulkin not cleaning up after herself or Dr. Caputo. Thompson stated: "I felt that I did not have to go and clean up after [Dulkin] or her doctor, and a lot of times she would leave her mess for others to clean up." (Thompson Depo. at 15.) Thompson also had conflicts with Dulkin regarding use of the autoclave, a piece of equipment used to sterilize medical instruments. Thompson stated that Dulkin would overload the autoclave, preventing sterilization of the instruments. Thompson also complained that she had limited access to the autoclave because of its location within the office, and that "there was always a time conflict of when [Dulkin] wanted to get hers in and mine in." Id. at 19. Thompson's conflicts with Dulkin were widely known throughout the office, and Thompson informed Kempe of such conflicts.
 {¶ 5} Thompson also testified regarding an incident between herself and Yee that occurred prior to the office Christmas party in December 2000, during Thompson's probationary period. Dr. Lewandowski observed Thompson and Yee shouting obscenities at each other on the day of the Christmas party. According to Thompson, Yee became angry after Thompson spoke to Kempe about Yee's treatment of a patient. Thompson testified that Yee yelled at her in front of a patient, put her hand on Thompson's arm, pointed her finger at Thompson's chest, and threatened to "kick [Thompson's] ass after work[.]" Id. Yee denied Thompson's version of the incident, but admitted that she did have a conflict with Thompson around the time of the Christmas party. According to Yee, she asked Thompson to clear the hallway, and Thompson responded by telling Yee to "mind [her] own F-ing business and she knew her F-ing job." (Yee Depo. at 21.) Yee spoke to Kempe about her incident with Thompson.
 {¶ 6} On December 20, 2000, Kempe held a staff meeting for GOPSA staff and Dulkin to address ongoing conflicts between Thompson and other staff members. Kempe stated that the incident between Thompson and Yee before the Christmas party "was so big to me that I felt we needed to do something about the problem." (Kempe Depo. at 42.) Thompson admits that she was aware of the personality conflicts and problems between staff members as of the December 20, 2000 staff meeting, "where we all discussed our conflicts with each other." (Thompson Depo. at 32-33.)
 {¶ 7} On December 29, 2000, Kempe met with Thompson for her 90-day review and informed Thompson that she wanted to extend her probationary period "because of all the conflicts[.]" (Thompson Depo. at 23.) Kempe and Thompson specifically discussed Thompson's conflicts with Dulkin, and Thompson stated that she believed the conflicts had been resolved. At that meeting, Thompson signed a memorandum identifying "disconcerting feelings among employees in this office which appear to be a problem" and "personality conflicts which have actually [a]ffected the functioning of [GOPSA and UPFS]." (Thompson Depo., Exh. 3.) The memorandum provided that Thompson's probationary period was extended an additional 60 days because Kempe felt "it is important that this problem be absolutely resolve[d]." Id. Drs. Lewandowski and Vaccarello approved the extension of Thompson's probationary period prior to Kempe's December 29, 2000 meeting with Thompson.
 {¶ 8} On January 22, 2001, during her extended probationary period, Thompson injured her knee while assisting an obese patient. Thompson reported her injury to Kempe, who suggested that Thompson should get an x-ray. Despite Kempe's suggestion, Thompson did not seek immediate medical treatment and did not miss any work that week. On February 1, 2001, while Kempe was on vacation, Thompson filed a claim with the Ohio Bureau of Workers' Compensation ("BWC") regarding her knee injury. Kempe first became aware of Thompson's workers' compensation claim when she received a claim form from the BWC on February 6, 2001. Kempe questioned Thompson about why she did not inform GOPSA of her intention to file a claim, but after informing Drs. Lewandowski and Vaccarello of Thompson's workers' compensation claim, ultimately certified the claim on February 8, 2001.
 {¶ 9} Thompson alleges that, after her injury, Dr. Lewandowski referred to her as "Come Along" and "Gimp" in front of other staff members and patients. (Thompson Depo. at 48, 51-52.) Thompson also testified that she was subjected to an increased workload because of double-booked patients or a heavy schedule, and that Dr. Lewandowski became angry when she could not keep up. Graham testified that the doctors referred to Thompson as "lazy" after her injury. (Graham Depo. at 65-66.)
 {¶ 10} After certifying Thompson's workers' compensation claim, Kempe prepared an incident report regarding Thompson's injury, and she asked Thompson to sign the report on February 14, 2001. Although Thompson admits that the report accurately described the incident leading to her injury, Thompson requested time to review the report, and Kempe asked Thompson to sign the report and return it the following day. Kempe believes that Thompson indicated that she wanted to have attorney Donald Fortunate, whom Thompson was dating at the time, review the incident report. Kempe and Dr. Lewandowski were aware that Thompson was dating an attorney while she was employed by GOPSA. After work, Thompson contacted an attorney with the BWC and also consulted with Mr. Fortunate regarding whether to sign the incident report. Upon legal advice, Thompson refused to sign the incident report and drafted a letter explaining her refusal to do so. Thompson placed the unsigned incident report and her response letter on Kempe's desk the following morning.
 {¶ 11} Kempe subsequently met with Thompson on February 23, 2001, at which time Kempe informed Thompson of her termination. Thompson testified that Kempe terminated her employment immediately upon noting that Thompson consulted an attorney. Kempe, on the other hand, testified that she obtained the agreement of Drs. Lewandowski and Vaccarello to terminate Thompson's employment earlier that week and that Thompson's employment was terminated based solely on the continuing personality conflicts between Thompson and other staff members. Drs. Lewandowski and Vaccarello confirmed that they agreed to terminate Thompson's employment, based on ongoing conflicts between Thompson and other staff members, prior to Kempe's February 23, 2001 meeting with Thompson.
 {¶ 12} Thompson originally filed a complaint against GOPSA in the Franklin County Court of Common Pleas on January 13, 2003, in case No. 03CVH01-454, which she voluntarily dismissed on December 3, 2004. On March 2, 2005, Thompson re-filed her claims against GOPSA. In her re-filed complaint, Thompson alleged claims for wrongful discharge in violation of public policy. Specifically, Thompson alleged that GOPSA terminated her employment in retaliation for her filing a workers' compensation claim and for having consulted with an attorney, in violation of the public policy expressed in R.C. 4123.90 and the common law of the state of Ohio.
 {¶ 13} On May 31, 2005, GOPSA filed a motion for summary judgment. GOPSA argued that Thompson's claim for wrongful termination in violation of the public policy set forth in R.C. 4123.90 was time-barred by the 180-day limitations period contained in that statute. Alternatively, GOPSA argued that no reasonable trier of fact could conclude that it terminated Thompson's employment based either on her filing of a workers' compensation claim or on her consultation with an attorney. Rather, GOPSA asserted that the undisputed evidence demonstrated that it discharged Thompson based on her continuing inability to get along with her co-workers.
 {¶ 14} On January 27, 2006, the trial court issued a decision granting GOPSA's motion for summary judgment based on Thompson's failure to comply with the 180-day limitations period set forth in R.C. 4123.90. On February 6, 2006, Thompson moved the trial court to reconsider its decision, arguing that her claim for wrongful discharge in violation of the public policy favoring her right to consult an attorney was not subject to the R.C. 4123.90 limitations period. The trial court agreed and, in a decision filed March 2, 2006, granted Thompson's motion for reconsideration. However, after considering the evidence in the record, the trial court concluded that GOPSA was nevertheless entitled to summary judgment on Thompson's claim for wrongful discharge in violation of the public policy favoring her right to consult an attorney. The trial court entered final judgment in favor of GOPSA on March 9, 2006, and Thompson filed a timely notice of appeal.
 {¶ 15} Thompson raises two assignments of error:
 Assignment of Error No. 1:
 Despite Appellant's testimony that she was immediately terminated by the office manager of GOPSA when she told her that she had reviewed an accident form with an attorney, the trial court erred when it dismissed Thompson's wrongful discharge in violation of public policy based upon the right to confer with counsel based upon weighing the testimony of other co-employees in of [sic] U.S. Supreme Court precedent and ignoring the direct evidence of improper motivation.
 Assignment of Error No. 2:
 Since the statute of limitations for a wrongful discharge claim has been determined to be four years by the Ohio Supreme Court, the trial court erred when it applied the shorter limitations period of the Workers' Compensation Antiretaliation statute.
 {¶ 16} In her first assignment of error, appellant contends that the trial court erred by granting summary judgment on her claim that GOPSA wrongfully terminated her employment in retaliation for consulting an attorney, in violation of public policy. Appellate review of summary judgments is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588, citing Brown v. Scioto Cty. Bd. of Commrs. (1993),87 Ohio App.3d 704, 711. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Maust v. Bank One Columbus,N.A. (1992), 83 Ohio App.3d 103, 107; Brown at 711.
 {¶ 17} Pursuant to Civ.R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party.Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66.
 {¶ 18} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt (1996), 75 Ohio St.3d 280, 292. Once the moving party meets its initial burden, the non-movant must produce competent evidence of the types listed in Civ.R. 56(C) showing that there is a genuine issue for trial. Id. at 293. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the nonmoving party.Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-359.
 {¶ 19} In Greeley v. Miami Valley Maintenance Contrs., Inc. (1990),49 Ohio St.3d 228, the Ohio Supreme Court acknowledged an exception to the employment-atwill doctrine and created a cause of action in tort for wrongful discharge in violation of public policy. The Supreme Court held that "the right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy." Id. at paragraph two of the syllabus. The Supreme Court subsequently expanded the tort of wrongful discharge in violation of public policy to encompass violations of clear public policy discerned as a matter of law from non-statutory sources, including the Ohio and United States Constitutions, administrative rules and regulations, and the common law. Painter v. Graley (1994), 70 Ohio St.3d 377, paragraph three of the syllabus.
 {¶ 20} The elements of a claim for wrongful discharge in violation of public policy are:
 "`1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
 "`2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
 "`3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
 "`4. The employer lacked overriding legitimate businessjustification for the dismissal (the overriding justificationelement).' (Emphasis sic.)["]
Kulch v. Structural Fibers, Inc. (1997), 78 Ohio St.3d 134, 151, quotingPainter at 384, fn. 8, quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399. The clarity and jeopardy elements of a wrongful discharge claim are questions of law, whereas the causation and overriding justification elements are questions of fact. Collins v.Rizkana (1995), 73 Ohio St.3d 65, 70.
 {¶ 21} This court has concluded that "the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine." Simonelli v.Anderson Concrete Co. (1994), 99 Ohio App.3d 254, 259. InSimonelli, this court found persuasive reasoning that " 'consultation with a lawyer is so fundamental to our system of justice that an employer's discharge of an employee for consulting a lawyer would violate public policy.' " Id., citing Thompto v. Coborn's Inc. (N.D.Iowa 1994), 871 F.Supp. 1097, 1121. GOPSA does not dispute that clear public policy favors an employee's right to consult legal counsel and that discharge of an employee for doing so violates that public policy. However, GOPSA argues that the record before the trial court contained no probative evidence that GOPSA discharged Thompson for consulting a attorney.
 {¶ 22} In granting summary judgment in favor of GOPSA, the trial court concluded that Thompson failed to establish either the third or fourth element of her claim, i.e., that her dismissal was motivated by conduct related to the public policy or that GOPSA lacked an overriding legitimate business justification for terminating her employment. On appeal, Thompson asserts that, when viewing the evidence in the light most favorable to her, GOPSA cannot avoid the clear inference that her consultation with an attorney was a reason for her termination.
 {¶ 23} Thompson first argues that the trial court erred by ignoring direct evidence of GOPSA's animus relating to her consultation with an attorney. According to Thompson, Kempe's notification to Thompson that she was fired immediately after Thompson stated that she had consulted an attorney constitutes direct evidence of animus and raises a genuine issue of material fact as to whether a causal connection exists between Thompson's exercise of her right to consult legal counsel and her termination. Direct evidence is " 'proof which speaks directly to the issue, requiring no support by other evidence.' " Carter v. RussoRealtors (May 22, 2001), Franklin App. No. 00AP-797, quoting Randle v.LaSalle Telecommunications, Inc. (N.D.Ill.1988), 697 F.Supp. 1474, 1478. It " 'directly proves a fact, without an inference or presumption; and which, if true, conclusively establishes that fact.' " Id.
 {¶ 24} The timing of Kempe's notification to Thompson that her employment was being terminated does not constitute direct evidence that the termination was motivated by Thompson's consultation with an attorney. Rather, such a conclusion would require the trier of fact to accept that Kempe learned of Thompson's consultation with an attorney immediately before terminating Thompson, as Thompson suggests, and also that Kempe had not already decided to terminate Thompson's employment. Although there is some conflict in the evidence as to when Kempe first learned of Thompson's consultation with an attorney, any inference that Kempe immediately and unilaterally decided to terminate Thompson at the February 23, 2001 meeting, based on Thompson's statement that she consulted an attorney, is contrary to undisputed evidence that Kempe lacked authority to unilaterally terminate Thompson's employment and that Drs. Lewandowski and Vaccarello agreed to terminate Thompson's employment prior to that meeting.
 {¶ 25} It is undisputed that Kempe lacked authority to unilaterally terminate GOPSA employees. Rather, Drs. Lewandowski and Vaccarello were responsible for making all GOPSA hiring and firing decisions, and Kempe had authority to terminate GOPSA employees only with the doctors' approval. Drs. Lewandowski and Vaccarello stated that, as the end of Thompson's probationary period approached, they agreed to terminate Thompson's employment because of ongoing conflicts between Thompson and other office staff and that their decision had nothing to do with Thompson's consultation with an attorney. Both doctors and Kempe stated that the decision to terminate Thompson's employment was made prior to Kempe's meeting with Thompson. Thompson identifies no evidence to dispute the testimony that the doctors agreed to discharge her prior to the February 23, 2001 meeting. Accordingly, given Kempe's lack of authority to unilaterally terminate Thompson's employment and the undisputed testimony that the doctors previously agreed to do so, Thompson's testimony regarding the timing of her termination does not constitute direct evidence and does not create a genuine issue of material fact as to whether GOPSA terminated her employment because of her consultation with an attorney.
 {¶ 26} Thompson's remaining arguments under her first assignment of error relate to the fourth element of her claim and the trial court's consideration of evidence regarding GOPSA's purported legitimate overriding business justification for terminating Thompson's employment. In the trial court and throughout this appeal, GOPSA has argued that personality conflicts between Thompson and other staff members and the resultant tension in the offices constituted an overriding, legitimate business justification for terminating Thompson's employment. Thompson contends that the trial court could not find that GOPSA had an overriding, legitimate business justification for terminating Thompson's employment without considering improper evidence and making improper credibility determinations. We disagree.
 {¶ 27} Each of GOPSA's other employees, along with non-employees Graham and Dulkin, testified regarding personality conflicts between Thompson and other staff members. Thompson herself admitted an ongoing conflict with Dulkin, as well as her heated verbal confrontation with Yee. Before the end of Thompson's original probationary period, Dr. Lewandowski was aware of increasing tension among GOPSA staff, including "bickering" between Thompson and Dulkin and between Thompson and Yee. (Lewandowski Depo. at 22-23.) The record contains undisputed evidence that, on December 20, 2000, Kempe held a staff meeting to address issues that had arisen regarding Thompson and other staff members not getting along. Additionally, it is undisputed that, on December 29, 2000, Thompson signed a document extending her probationary period an additional 60 days. That document provided, in part:
 * * * [T]here [have] been some disconcerting feelings among employees in this office which appear to be a problem. There are some personality conflicts which have actually effected the functioning of this office as well as that of [UPFS]. We, the employees, did have a meeting about this on Wednesday 12/20/00. There was much discussion, sometimes heated, feelings were confronted. I am hoping that this has helped us overcome this conflict. I am unsure of the long term effect of this discussion to be sure that the conflicting personalities can overcome their differences.
 I do feel, however, that it is important that this problem be absolutely resolve[d]. Because of this I am extending the probationary period for Ms. Thompson another 60 days. * * *
(Thompson Depo., Exh. 3.) Thus, Thompson was on notice that the reason for her extended probationary period was to ensure that the ongoing personality conflicts in the office were absolutely resolved.
 {¶ 28} Although Thompson testified that she was unaware of specific issues or problems between herself and other staff members during the month of January 2001, Thompson's testimony does not contradict the evidence that other staff members continued to feel tension in the workplace between the time of the December 20, 2000 meeting and Thompson's termination in late February 2001. Yee testified that attempts to diffuse the personality conflicts in the office after the December 20, 2000 meeting created ongoing tension in the office and that Thompson continued to exhibit an attitude of superiority. Elling testified that the general sense of dissension and personality conflicts in the office that began after Thompson was hired continued after the December 20, 2000 meeting and affected the functioning of the office. In her affidavit, Dulkin stated that the December 20, 2000 meeting did not improve staff relations and that tension among staff members was so great that she did not want to go to work. Dulkin stated that the conflicts between herself and Thompson and between Yee and Thompson affected the working environment for everyone.
 {¶ 29} Kempe and Dr. Lewandowski both provided additional testimony that personality conflicts and tension continued toward the end of Thompson's extended probationary period. Kempe testified that:
 When I would walk through the office and my experience of being in the office I saw that there was tensions between people and how they worked. They would either be overly polite or they weren't talking.
 So the general sense and general feeling in the office was not comfortable. It wasn't comfortable for me, it wasn't comfortable for anybody. This hadn't been that way before and it was not a way that people were going to continue to want to function and work.
 Things had not changed to a positive sense after our meeting in December. I think that there were efforts made that were unsuccessful in terms of people trying to be polite and so it was walking around on pins and needles.
(Kempe Depo. at 83-84.) Kempe also testified that Dulkin approached her in February 2001, and stated that she could not work there anymore because of tension and stress caused by Thompson. Dr. Lewandowski testified that, as the end of Thompson's extended 60-day probationary period neared, "given that this continuing undertow that seemed to be involving [Thompson] and a number of members of the staff did not improve, it looked like the issue that we had identified two months earlier had not improved." (Lewandowski Depo. at 33.)
 {¶ 30} Thompson argues that the trial court erred in considering the evidence of personality conflicts, contending that such consideration violates that directive of the United States Supreme Court in Reeves v.Sanderson Plumbing Prods., Inc. (2000), 530 U.S. 133. InReeves, the United States Supreme Court reviewed the denial of a motion for a judgment as a matter of law, pursuant to Fed.R.Civ.P. 50, and stated:
 * * * [A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright Miller 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." * * *
Id. at 151. We have previously distinguished Reeves on the basis that it involved appellate review of a denial of a motion for a judgment as a matter of law rather than a motion for summary judgment. See Kozma v.AEP Energy Servs., Inc., Franklin App. No. 04AP-643, 2005-Ohio-1157, at ¶ 20, citing Phelps v. Jones Plastic Engineering Corp. (C.A.6, 2001), 20 Fed.Appx. 352. In Phelps, the Sixth Circuit distinguished the standard for a Rule 50 motion, "where 'a party has been fully heard on an issue' at trial[,]" from the standard for a summary judgment motion, where the "court does not have the benefit of the full 'quantum of evidence produced' at a trial." Phelps at 356. The Sixth Circuit recognized that the summary judgment standard "addresses the limited, preliminary question of whether the plaintiff has produced sufficient evidence to demonstrate that a genuine issue of fact exists for the jury to decide, rather than the broader, decisive question of whether the plaintiff's evidence proves his case." Id. Given that distinction, inKozma, we reiterated that we conduct a de novo review of the entire record when reviewing a summary judgment.
 {¶ 31} Despite Thompson's misplaced reliance on Reeves, she does not identify any contradicted evidence relied upon by the trial court in granting summary judgment in favor of GOPSA. Nor do we find, as Thompson suggests, that the trial court improperly relied on Kempe's subjective beliefs in concluding that GOPSA had a legitimate business reason for terminating Thompson. Rather, the record contained ample, uncontradicted testimony, including testimony from Thompson herself, regarding personality conflicts between Thompson and other staff members. Thompson was wellaware of perceived problems from the December 20, 2000 staff meeting and the subsequent extension of her probationary period. Moreover, undisputed evidence demonstrates that no tension existed amongst GOPSA staff prior to or following Thompson's employment. Thus, the trial court properly relied on uncontradicted evidence and, upon review, we find no error in the trial court's consideration of evidence of personality conflicts and issues between Thompson and other staff members.
 {¶ 32} In her final argument under her first assignment of error, Thompson argues that the trial court failed to focus on the critical time frame, which Thompson identifies as the moment Kempe informed Thompson of her discharge. Claiming that an employer's statement at the time of an adverse action is often the best evidence of the employer's state of mind, Thompson contends that the critical issue is Kempe's motivation at the moment she decided to discharge Thompson after learning that Thompson had spoken with an attorney. However, Thompson's argument ignores the undisputed evidence that Drs. Lewandowski and Vaccarello made the decision to terminate her employment, based on Thompson's ongoing inability to get along with her co-workers, prior to her February 23, 2001 meeting with Kempe. This court has previously distinguished between the time of discharge and the time an employee is notified of the discharge, recognizing that the act of discharge contemplates a unilateral act by the employer without the consent of the employee. See Gleich v. J.C. Penney Co., Inc. (Aug. 8, 1985), Franklin App. No. 85AP-276. Thompson presents no evidence contradicting Kempe's testimony that she obtained the doctors' approval for discharging Thompson during the week prior to her meeting with Thompson. Thus, contrary to Thompson's contention, the evidence demonstrates that the decision to terminate her employment was not made at the February 23, 2001 meeting between Kempe and Thompson. Accordingly, we reject Thompson's argument that the trial court erred by failing to focus specifically on the time Kempe notified Thompson of her termination.
 {¶ 33} Viewing the evidence in the light most favorable to Thompson, we conclude that Thompson failed to raise a genuine issue of material fact as to whether her consultation with an attorney motivated her discharge or as to whether GOPSA lacked an overriding legitimate business justification for the discharge. Consequently, we overrule Thompson's first assignment or error.
 {¶ 34} We now turn to Thompson's second assignment of error, which concerns her claim for wrongful discharge in violation of the public policy expressed in R.C. 4123.90. In part, R.C. 4123.90 prohibits an employer from discharging an employee for filing a workers' compensation claim and provides that a claim for a violation of R.C. 4123.90 must be filed within 180 days after the discharge. Thompson argues that GOPSA terminated her employment in retaliation for her filing a workers' compensation claim, in violation of the public policy embodied in R.C.4123.90. Under her second assignment of error, Thompson argues that the trial court erred in applying the 180-day limitations period contained in R.C. 4123.90 to her claim for wrongful discharge in violation of the public policy expressed therein and in granting GOPSA's motion for summary judgment based on her non-compliance with the limitations period. Thompson contends that the four-year statute of limitations set forth in R.C. 2305.09 applies to her public policy claim and that the trial court's application of the shorter limitations period is contrary to the Ohio Supreme Court's holding in Pytlinski v. Brocar Prod.,Inc. (2002), 94 Ohio St.3d 77.
 {¶ 35} GOPSA does not contest that Ohio courts recognize a cause of action for wrongful discharge in violation of the public policy underlying R.C. 4123.90. However, GOPSA argues that Thompson's public policy claim fails because Thompson failed to file her claim within 180 days, as required by R.C. 4123.90. Thompson, on the other hand, asserts that the 180-day limitations period set forth in R.C. 4123.90 is inapplicable to her claim, which is not for violation of R.C. 4123.90
itself but for wrongful discharge in violation of the public policy expressed therein.
 {¶ 36} To determine whether the R.C. 4123.90 limitations period applies to, and thus bars, Thompson's claim, we first review key cases predating the Supreme Court's Pytlinski opinion. In Contreras v. FerroCorp. (1995), 73 Ohio St.3d 244, the Ohio Supreme Court reviewed a summary judgment entered in favor of the appellant's former employer on the appellant's claims for violation of R.C. 4113.52, Ohio's whistleblower statute, and for wrongful discharge premised on violation of the public policy embodied therein. After determining that the appellant had not satisfied the statutory requirements necessary to maintain his cause of action for violation of R.C. 4113.52, the Supreme Court found that appellant's arguments regarding his public policy claim were moot. The court stated:
 If appellant was entitled to maintain a Greeley claim, an issue that today we do not decide, then that claim would have to be based upon the public policy embodied in R.C. 4113.52. Since appellant did not comply with the statute in the first instance he would have no foundation for a Greeley claim if, in fact, he was entitled to assert such a claim. * * *
Id. at 251.
 {¶ 37} Subsequently, in Kulch, the Ohio Supreme Court again considered whether compliance with an underlying statute is a prerequisite for a claim of wrongful discharge in violation of the public policy embodied therein. Kulch alleged that his employer discharged him in retaliation for filing complaints with the Occupational Safety and Health Administration ("OSHA"). Like the appellant in Contreras, Kulch asserted claims against his former employer for violation of R.C. 4113.52 and for wrongful discharge in violation of public policy. The trial court granted the employer's motion for judgment on the pleadings and for summary judgment, concluding that Kulch failed to comply with the requirements of R.C. 4113.52 and that no public policy exception to the employment-at-will doctrine exists in Ohio for whistleblowing. The court of appeals affirmed.
 {¶ 38} The Ohio Supreme Court first disagreed with the lower courts' findings that R.C. 4113.52 pre-empted a common-law cause of action for wrongful discharge in violation of the public policy embodied in R.C.4113.52. To the contrary, the court resolved the issue left undecided inContreras and held that "[a]n at-will employee who is discharged or disciplined for filing a complaint with [OSHA] concerning matters of health and safety in the workplace is entitled to maintain a common-law tort action against the employer for wrongful discharge/discipline in violation of public policy pursuant to [Greeley] and its progeny."Kulch, paragraph one of the syllabus. Having determined that Ohio recognizes an exception to the employment-at-will doctrine based on public policy favoring whistleblowing, the court went on to consider whether the employer was nevertheless entitled to summary judgment on Kulch's wrongful discharge claim.
 {¶ 39} The Supreme Court was "easily able to identify at least two main sources of public policy prohibiting the alleged retaliatory discharge of [Kulch] based on his report to OSHA[,]" each of which was "independently sufficient to justify an exception to the employment-at-will doctrine and to warrant recognition of a cause of action for wrongful discharge in violation of public policy." (Emphasis added.) Id. at 151. Specifically, the Supreme Court identified the sources of public policy as: (1) Section 660(c), Title 29, U.S. Code, which prohibits employers from retaliating against employees who file OSHA complaints, consistent with Ohio public policy favoring workplace safety; and (2) R.C. 4113.52, "which embodies a clear public policy favoring whistleblowing." Id. at 151, 153.
 {¶ 40} After addressing the independent public policy favoring workplace safety, the Supreme Court considered whether Kulch could also base his wrongful discharge claim on violation of the public policy embodied in R.C. 4113.52. Although acknowledging that R.C. 4113.52
expressed a clear public policy upon which a wrongful discharge claim could be based, the Supreme Court noted that the public policy embodied in R.C. 4113.52 is limited. "By imposing strict and detailed requirements on certain whistleblowers and restricting the statute's applicability to a narrow set of circumstances, the legislature clearly intended to encourage whistleblowing only to the extent that theemployee complies with the dictates of R.C. 4113.52." (Emphasis sic.) Id. at 153. The court stated: "The obvious implication ofContreras is that an employee who fails to strictly comply with the requirements of R.C. 4113.52 cannot base a Greeley claim solely upon the public policy embodied in that statute." Id.
 {¶ 41} The court reiterated that, in Contreras, "the public policy embodied in R.C. 4113.52 could not have supported [the employee's] claim, since the employee had failed in the first instance to comply with the dictates of the statute." Id. at 154. Likewise, because Kulch failed to strictly comply with the notice requirements of R.C.4113.52(A)(1)(a), the court stated: "[I]t is clear that appellant has no foundation for a Greeley claim based on the public policy embodied in R.C. 4113.52 protecting employees who report matters in accordance with R.C. 4113.52(A)(1)(a)." (Emphasis sic.) Id. However, after determining that Kulch may have complied with the independent requirements of R.C.4113.52(A)(2), the Supreme Court stated:
 * * * [A]ssuming that [Kulch] complied with the reporting requirements of R.C. 4113.52(A)(2) and that [the employer] retaliated against him in a manner contrary to the terms of the Whistleblower Statute, [Kulch] has stated [an] independent foundation for a Greeley claim premised upon the clear public policy embodied in R.C. 4113.52.
(Emphasis added.) Id.
 {¶ 42} Because, unlike the appellant in Contreras, Kulch may have complied with R.C. 4123.52(A)(2), the Supreme Court held:
 * * * [T]o the extent that he complied with R.C. 4113.52, appellant has established a firm foundation for a Greeley claim for wrongful discharge in violation of the public policy embodied in the Whistleblower Statute. Additionally, and in any event, [Kulch's] Greeley claim is fully and independently supported by the first source of public policy identified in our discussion * * * the clear public policy of this state encouraging safety in the workplace and forbidding retaliation against those who file OSHA complaints aimed at correcting unsafe and unhealthy working conditions.
Id. Accordingly, Kulch's Greeley claim survived only to the extent that Kulch complied with R.C. 4113.52(A)(2) and/or to the extent that it was based on a public policy independent of that embodied in R.C. 4113.52.
 {¶ 43} In Stephenson v. Yellow Freight Systems, Inc. (Oct. 26, 1999), Franklin App. No. 99AP-77, this court applied the Supreme Court's holding in Kulch to a claim of wrongful discharge in violation of the public policy embodied in R.C. 4123.90. In Stephenson, the appellant alleged that his employer terminated his employment in retaliation for having applied for and received living maintenance wage loss and rehabilitation wage loss payments under the workers' compensation system. As an initial matter, this court concluded that Stephenson'sGreeley claim failed because Stephenson was not an at-will employee. Nevertheless, this court went on to address the requirements of Stephenson's purported Greeley claim.
 {¶ 44} Although Stephenson argued that limiting Greeley claims to at-will employees violated federal law, we did not reach that argument, instead concluding that Stephenson would have been unable to maintain aGreeley claim because he failed to comply with the time requirements of R.C. 4123.90. Following Kulch, we stated:
 It is clear that in order for an at-will employee to bring a Greeley claim based upon the public policy embodied in R.C. 4123.90, such employee must have complied with the requirements set forth in R.C. 4123.90. Appellant did not so comply. Therefore, even if appellant was an at-will employee, he would not have a Greeley claim due to his failure to comply with R.C. 4123.90. * * *
 Stephenson.
 {¶ 45} Here, based on Stephenson, the trial court agreed with GOPSA's position that Thompson's failure to comply with the 180-day limitations period contained in R.C. 4123.90 bars Thompson's wrongful discharge claim based on the public policy set forth in R.C. 4123.90. On appeal, Thompson argues that the trial court's reliance on Stephenson was misplaced in light of the Ohio Supreme Court's more recent ruling inPytlinski. Thompson contends that, pursuant to Pytlinski, all claims of wrongful discharge in violation of public policy are subject to a four-year statute of limitations, as set forth in R.C. 2305.09. We turn now to Pytlinski.
 {¶ 46} Like Kulch, Pytlinski involved a claim for wrongful termination in violation of the public policy favoring workplace safety. InPytlinski, the Supreme Court examined the issue of whether the 180-day limitations period set forth in R.C. 4113.52 applied to Pytlinski's claim for wrongful discharge in violation of public policy. Pytlinski averred that he was terminated in violation of Ohio public policy favoring workplace safety because his termination was predicated upon his complaints pertaining to violations of law, including OSHA regulations, regarding workplace safety. Pytlinski did not specifically allege a violation of R.C. 4113.52. Nevertheless, the trial court dismissed Pytlinski's complaint, concluding that it was time-barred by the 180-day limitations period contained in R.C. 4113.52, and the court of appeals affirmed. The Supreme Court reversed the dismissal of Pytlinski's claim.
 {¶ 47} The Supreme Court noted that Pytlinski claimed he was discharged in violation of Ohio public policy favoring workplace safety and did not allege a violation of R.C. 4113.52. The court reiterated its earlier recognition, in Kulch, of Ohio's independent public policy favoring workplace safety. At paragraph one of the syllabus, the Supreme Court held that "Ohio public policy favoring workplace safety is anindependent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." (Emphasis added.) At paragraph two of the syllabus, the Supreme Court held that "[a] common-law cause of action against an employer who discharges an employee in violation of public policy favoring workplace safety is subject to the four-year limitations period set forth in R.C. 2305.09(D)."
 {¶ 48} In Pytlinski, the Supreme Court found its holding inKulch controlling. Because Pytlinski's claim was based on the independent public policy favoring workplace safety and not upon the public policy embodied in R.C. 4113.52 favoring whistleblowing, the court concluded that Pytlinski was not bound by the limitations period contained in R.C. 4113.52. The Supreme Court's ultimate conclusion that a common-law cause of action against an employer who discharges an employee in violation of public policy favoring workplace safety is subject to a four-year limitations period does not conflict with its conclusion in Kulch that a cause of action for wrongful discharge in violation of public policy based solely on a statute is subject to the requirements of that statute. As noted by the Second District Court of Appeals, "[t]he Pytlinski court did not address Greeley claims based solely upon a violation of a statute." Barlowe v. AAAA Internatl.Driving School, Inc., Montgomery App. No. 19794, 2003-Ohio-5748, at ¶ 38.
 {¶ 49} Here, we reject Thompson's argument that Pytlinski eliminates any requirement that she comply with the 180-day limitations period contained in R.C. 4123.90. Unlike the instant case, Pytlinksi did not involve a claim for wrongful discharge in violation of a public policy embodied in a statute. Nor did Pytlinski alter the Supreme Court's prior recognition that non-compliance with statutory requirements is fatal to a wrongful termination claim based solely upon an alleged violation of the public policy embodied in the statute.
 {¶ 50} In at least one post-Pytlinski case, this court has continued to hold that a plaintiff may not bring a public policy tort claim based on the public policy embodied in a statute unless she either complies with the statute embodying the public policy or identifies an independent source of public policy supporting her claim. See Lesko v.Riverside Methodist Hosp., Franklin App. No. 04AP-1130, 2005-Ohio-3142, at ¶ 34. In Lesko, the appellant brought claims against her former employer for violation of R.C. 4113.52 and for wrongful discharge in violation of public policy. The trial court granted summary judgment in favor of the employer after concluding that the appellant's claims were time-barred because the appellant did not comply with the statutory requirements of R.C. 4113.52. On appeal we affirmed, concluding that the appellant's whistleblower claim was barred because the appellant did not file her claim within the 180-day statute of limitations set forth in R.C. 4113.52. With respect to the appellant's public policy claim, we stated:
 To sustain a public policy claim based on R.C. 4113.52, appellant must strictly comply with the mandates of that legislation in order to obtain relief. Kulch v. Structural Fibers, Inc. (1997), 78 Ohio St.3d 134, 677 N.E.2d 308. Because we have found that appellant did not strictly comply with the mandates of R.C. 4113.52, appellant's public policy claims based on that legislation must fail.
Id. at ¶ 32. Because the appellant could not establish "a clear public policy * * * that exist[ed] separate and apart from the dictates of R.C. 4113.52[,]" we found that the appellant's public policy claim failed as a matter of law. Id. at ¶ 35; see, also, Shaffer v. OhioHealthCorp., Franklin App. No. 04AP-236, 2004-Ohio-6523, at ¶ 27 (holding that failure to strictly comply with the requirements of R.C. 4113.52(A)(1) precluded tort claim based solely on the public policy embodied therein).
 {¶ 51} Similarly, in Butler v. The Cleveland Christian Home, Cuyahoga App. No. 86108, 2005-Ohio-4425, at ¶ 10, the Eighth District Court of Appeals found that a complaint for wrongful discharge in violation of the public policy embodied in R.C. 4123.90 failed where the appellant did not commence her action within the 180-day limitations period contained in R.C. 4123.90. The court stated that appellant could maintain a common-law cause of action on the basis of the public policy set forth in Ohio's workers' compensation statutes only if she satisfied all applicable statutory requirements, including the 180-day limitations period. See, also, Tablack v. Wellman, Mahoning App. No. 04-MA-218,2006-Ohio-4688, at ¶ 108 (holding that the appellant could maintain a public policy claim without complying with the 180-day limitations period in R.C. 4112.02 only if the appellant relied on some source of public policy other than the statute); McNett v. Hardin Comm. Fed.Credit Union, Allen App. No. 1-04-46, 2004-Ohio-6957, at ¶ 21.
 {¶ 52} Here, Thompson concedes that her claim of wrongful termination for having filed a workers' compensation claim is based on the public policy expressed in R.C. 4123.90, and Thompson identifies no other independent source of public policy in support of her claim. Because Thompson bases her claim solely on the public policy expressed in R.C.4123.90, non-compliance with the requirements of that statute, including the 180-day limitations period, is fatal to that claim. Thompson undisputedly failed to file her complaint within the 180-day limitations period. Accordingly, the trial court did not err in finding Thompson's public policy claim time-barred, and we overrule Thompson's second assignment of error.
 {¶ 53} Having overruled Thompson's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.